[No. D044931. Fourth Dist., Div. One. Sept. 13, 2006.]

STEVEN GRASSILLI, Plaintiff and Respondent, v.
RICHARD BARR et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication
with the exception of parts III., IV., VI., VII., and VIII. of the Discussion section.

## COUNSEL

Bill Lockyer, Attorney General, James Humes, James M. Schiavenza, Assistant Attorneys General, Kristin G. Hogue and David F. Taglienti, Deputy Attorneys General, for Defendants and Appellants.

Donna Bader; Garrison & McInnis, Gregory M. Garrison, Michael W. Strain and Amelia A. McDermott for Plaintiff and Respondent.

## OPINION

**HALLER, Acting P. J.**—Steven Grassilli brought a federal civil rights claim against several California Highway Patrol (CHP) officers, alleging these officers violated his constitutional rights by engaging in a series of actions against him because he complained about a CHP officer's improper conduct. (42 U.S.C. § 1983.)[1] The first trial ended in a defense verdict. In a prior unpublished decision, we reversed the judgment because the trial court erroneously excluded evidence relevant to Grassilli's constitutional retaliation claim. (*Grassilli v. Barr* (May 10, 2002, D037942) (*Grassilli I*).)

After a lengthy second trial, the jury found that CHP Officer Richard Barr and Sergeant Michael Toth wrongfully retaliated against Grassilli because Grassilli reported Officer Barr's improper conduct to CHP management, and that Sergeant Toth and Sergeant Stephen Neumann were also liable for retaliation based on their positions as Officer Barr's supervisory officers. The jury found the retaliation caused Grassilli to suffer $210,000 in economic

---

[1] All further statutory references are to title 42 of the United States Code, unless otherwise specified.

damages and $290,000 in noneconomic damages. The jury awarded Grassilli $3 million in punitive damages against Officer Barr and approximately $1 million against Sergeant Toth. The court awarded Grassilli $800,000 in attorney fees. (§ 1988(b).)

On appeal, Officer Barr, Sergeant Toth, and Sergeant Neumann (defendants) challenge the liability findings, the compensatory and punitive damages awards, and the attorney fees amount. We reject these contentions, except those regarding the punitive damages awards.

In the published portion of the opinion, we hold that substantial evidence supported the finding that defendants were liable under section 1983. This finding was based on evidence that defendants engaged in, or authorized, a series of law enforcement actions—including traffic stops, equipment compliance citations, and a vehicle impoundment—to retaliate against Grassilli after he complained to CHP management about Officer Barr.

In upholding the jury's liability finding, we reject defendants' argument based on *Hartman v. Moore* (2006) 547 U.S. 250 [164 L.Ed.2d 441, 126 S.Ct. 1695], that the judgment must be reversed because Grassilli did not prove that the officers lacked probable cause when they participated in the law enforcement contacts forming the basis for the section 1983 action. We conclude *Hartman* is inapplicable to most of Grassilli's claims because these claims were not brought on a retaliatory prosecution theory and the claimed damages did not result from criminal charges pursued by a prosecuting agency. As to the remaining claims, we find defendants waived their rights to assert *Hartman* error.

We further conclude the approximate $1 million and $3 million punitive damages awards against Officer Barr and Sergeant Toth are excessive. The awards violate federal constitutional principles; the imposition of the awards would indisputably result in defendants' financial ruin, a circumstance prohibited by state and federal law; the jury was not given proper guidance regarding the relevance of the financial condition evidence; and the awards include damages impermissibly imposed to punish the conduct of persons other than Officer Barr and Sergeant Toth.

Applying the established analysis for assessing a punitive damage award, we strike the punitive damages awards and remand to the superior court with directions to: (1) enter a punitive damages award against Officer Barr in the amount of $35,000, or at Grassilli's option to conduct a new trial on the proper amount of punitive damages; and (2) enter a punitive damages award against Sergeant Toth in the amount of $20,000, or at Grassilli's option to conduct a new trial on the proper amount of punitive damages. We also strike $25,000 from the cost award. We affirm the judgment in all other respects.

## FACTS

Under well-established appellate rules, we state the facts in the light most favorable to the jury's findings.

During the 1990's, Grassilli lived in Santa Ysabel, a rural area near Ramona. Grassilli owned a small business that sold, installed, and serviced residential underground water tanks and pumps. Grassilli was a classic car enthusiast and regularly attended car shows in his older El Camino vehicle.

In March 1997, Grassilli called the local CHP office to complain that Officer Barr, a Ramona resident CHP officer,[2] was violating the law because he had removed the catalytic converter from his private vehicle, but was citing other drivers for this same violation. Grassilli said Officer Barr had indicated he did not need a catalytic converter because he had a badge. Grassilli was initially reluctant to give his name, but finally agreed to do so. Grassilli based the complaint on information he received from his friend and from a mechanic who worked at the automobile shop where Officer Barr had performed the work to remove the catalytic converter. Grassilli also later verified that Officer Barr's truck did not have a catalytic converter when he inspected the truck when it was parked near Lake San Vicente.

When no action was taken on his complaint, Grassilli again called the local CHP office and eventually spoke with Sergeant Toth, one of Officer Barr's supervisors. Sergeant Toth immediately discussed Grassilli's complaint with another sergeant, Sergeant Mayfield, and then Sergeant Toth volunteered to go to Officer Barr's home to check Officer Barr's truck. According to Sergeant Toth, he called Officer Barr on the CHP radio and then inspected the truck before Officer Barr arrived home. Sergeant Toth claimed he saw a stock catalytic converter on Officer Barr's truck. Officer Barr gave conflicting testimony, stating Sergeant Toth met him at the Ramona sheriff's station and that he was present when Sergeant Toth inspected the vehicle.

After his inspection, Sergeant Toth advised Sergeant Mayfield that Grassilli's allegations against Officer Barr were not true. Sergeant Mayfield then notified Grassilli that Officer Barr's truck had a catalytic converter and he considered the matter closed. In response, Grassilli called the Sacramento CHP internal affairs office to report that Officer Barr did not have a catalytic converter on his pickup truck, and he had been told Officer Barr would retaliate against him for initiating the complaint.

After Grassilli's call, the CHP internal affairs office ordered an investigation of Grassilli's complaint. In response, on April 14, 1997, Sergeant

---

[2] Under the CHP's resident officer program, less populated areas are served by "resident officers," who live in the area and are on call from their homes.

Mayfield met with Grassilli, filled out a CHP form that listed Grassilli's complaints against Officer Barr, and requested Grassilli to sign the form. Shortly thereafter, Sergeant Mayfield concluded that Grassilli's complaint was false and malicious, and forwarded a recommendation to the district attorney that Grassilli be criminally prosecuted for making a false complaint against an officer. Sergeant Toth and Officer Barr each denied any knowledge of Sergeant Mayfield's action, but inferences from the evidence indicated they supported Sergeant Mayfield's decision to pursue the criminal charges.

Thereafter, Officer Barr and Sergeant Toth took actions against Grassilli. We summarize these actions below.

*April 27, 1997 El Camino Stop*

Thirteen days after the Mayfield-Grassilli meeting, on April 27, 1997, Officer Barr made a traffic stop of Grassilli while Grassilli was driving his classic El Camino car. Officer Barr told Grassilli he was stopping him because his vehicle did not have the requisite smog equipment. Grassilli had driven this car in and around the Ramona area for the previous seven years and had never been stopped for any smog or equipment violations. Grassilli told Officer Barr that he was a resident of Santa Ysabel (as reflected on his driver's license), and therefore he was not required to have the smog equipment. Officer Barr nonetheless ticketed him for a smog violation and having an obstructed view created by a raised air cleaner on the vehicle hood. (Veh. Code, §§ 27156, subd. (b), 26708, subd. (a).) Grassilli hired an attorney, and after a court trial, the court dismissed the smog violation based on its finding that Santa Ysabel residents are not required to obtain smog equipment certification until an ownership change.[3] The court found Grassilli guilty of the vision obstruction charge, and Grassilli thereafter lowered the air cleaner on his hood.

*September 1997 Criminal Prosecution Dismissed*

Based on Sergeant Mayfield's report, the district attorney filed a misdemeanor complaint alleging two counts against Grassilli, each of which carried a one-year maximum jail term: (1) making a false report against an officer (Pen. Code, § 148.6, subd. (a)(1)); and (2) dissuading an officer (Pen. Code, § 148.6, subd. (b)). The prosecutor dismissed the second count before trial. The trial was held in September 1997. After Officer Barr, Sergeant Toth, and Sergeant Mayfield testified in favor of the prosecution, the court dismissed the case for insufficient evidence.

---

[3] At trial, the jury was instructed (without objection) that Santa Ysabel residents "are not required to be certified" for smog equipment.

*October 1997 Tibbans Truck Stop*

About five weeks later, in October 1997, Officer Barr stopped a commercial truck that was following Grassilli to a jobsite. Officer Barr knew the truck was associated with Grassilli's business before he detained it. The truck was towing a trailer carrying a water tank approximately 11 feet 10 inches wide, and was operating under an annual Caltrans permit that allowed the truck to tow a load up to 12 feet wide. The truck was owned by James Tibbans, who was Grassilli's primary water tank supplier.

During the stop, the truck driver showed Officer Barr his Caltrans permit. Officer Barr told the truck driver he was violating the Vehicle Code because he needed a pilot car, mirror extensions, and red warning flags. Officer Barr refused to allow the truck to continue until each of these items was remedied. When Grassilli (who was also present at the scene) asked Officer Barr to call a sergeant for assistance, Officer Barr called Sergeant Toth. Sergeant Toth arrived 30 minutes later, and generally supported Officer Barr's actions without making any independent determination as to whether Officer Barr was correct. The stop took at least three hours and substantially interfered with Grassilli's work schedule.

Officer Barr ticketed the Tibbans truck driver. Although the driver later pled no contest to the three violations, testimony from Grassilli's expert witness and other CHP officers showed that the truck driver had not violated these code sections, and/or that the alleged violations were not a proper basis for taking the commercial vehicle out of service and requiring an immediate correction before the truck could continue.

*January 1998–August 1998 Scheme to Impound Grassilli's Vehicle*

Approximately three months after the Tibbans truck stop, Officer Barr told Sergeant Toth of an "anonymous tip" that Grassilli's new work truck was not properly registered.[4] Grassilli had recently purchased the truck in another state and placed his existing personalized license plate on the new vehicle.

Shortly after he learned this information, Sergeant Toth decided he would not provide Grassilli the opportunity to correct the registration problem by giving him a "fix-it" ticket, and instead he would wait six months, which is the time period specified in the Vehicle Code for expired registrations becoming subject to impound. (See Veh. Code, § 22651, subd. (o).) Sergeant

---

[4] The evidence regarding how Sergeant Toth and Officer Barr learned this information was contradictory (several CHP officers gave inconsistent versions of the events), but there was a reasonable basis to conclude that Officer Barr was a source of the "anonymous" tip.

Toth specifically wanted to ensure Grassilli's violation resulted in an impound, rather than a notice to remedy. To this end, Sergeant Toth told the other Ramona CHP officers not to notify Grassilli of the registration problem or give Grassilli a citation for the alleged violation. Sergeant Toth said that after the six-month period, he would be the one to stop Grassilli, give Grassilli a citation, and impound his vehicle. During the next several months, Sergeant Toth saw Grassilli's truck on "almost a daily basis."

The six-month period ended July 31, 1998. Early the next day, Officer Toth told his officers "today is the day we are going to take [Grassilli's] truck." Sergeant Toth then instructed one of the Ramona CHP officers, Officer Craig Thetford, to look for Grassilli's truck and then notify Sergeant Toth or Officer Barr when he found the truck. Within several hours, Officer Thetford radioed Sergeant Toth that he saw Grassilli driving his truck. Sergeant Toth drove to that location, and pulled over Grassilli's vehicle. When Sergeant Toth told Grassilli. he was going to impound the truck for a registration violation, Grassilli was surprised and upset, and had no idea there was any problem with the registration. Grassilli's wife generally handled those matters, and she testified she had been told she had done everything she was required to do to properly register the vehicle and to use the previous license plate. Two days later, after paying the requisite fees, Grassilli was able to retrieve his vehicle.

Sergeant Toth admitted it was not normally his duty to write registration tickets. In his 32-year career, he had never before allowed a known violation to mature so he could impound a vehicle.

*Officer Barr's December 27, 1998 Traffic Stop of Grassilli's El Camino*

Several months later, on December 27, 1998, Officer Barr again stopped Grassilli while he was driving his El Camino; Grassilli's young son was also in the car. Officer Barr cited Grassilli for several violations: (1) three separate counts pertaining to Grassilli's operating his vehicle without smog equipment after being notified of the violation; (2) one count of not having his driver's license in his possession; and (3) one count of vision obscurement through the windshield. In response to a radio call, Sergeant Neumann came to the scene, but he permitted Officer Barr to cite Grassilli for the various violations and supported Officer Barr's actions without any investigation. Although Grassilli told Officer Barr that his prior smog citation had been dismissed (and therefore there was no prior smog violation) and that he had "won the exact same ticket," Officer Barr cited him for the smog violations. Officer Barr believed that if the smog violation had been dismissed, the court was wrong in doing so. Officer Barr also cited Grassilli for the hood equipment even though he was aware that the equipment had been lowered, and had

been signed off by another officer. The smog violations were later dismissed by the court, and the other violations were signed off by law enforcement officers.

Thereafter, Officer Barr performed his own independent "research" on the smog equipment issue, and, based on this research, Officer Barr formed his own opinion that the court was twice wrong in dismissing the smog violation and concluded he would continue to ticket Grassilli for the lack of smog equipment.

*Officer Barr's July 28, 1999 Stop of Tibbans Truck*

Approximately seven months later, on July 28, 1999, Officer Barr stopped another Tibbans truck that was carrying a large water tank to Grassilli's jobsite. Officer Barr knew the truck driver was delivering the tank to Grassilli's work site, and stopped the truck for failure to have extended mirrors and driving on a "brown" route without a pilot car in violation of its permit. Sergeant Toth came to the scene in response to Officer Barr's radio call. Officer Barr placed the truck out of service, and refused to allow the truck driver to continue after the citation was given. The truck was detained more than three hours. Officer Barr came back three or four times and each time found something new for the driver to do before he would release the truck.

In response to Grassilli's request, CHP Officer Michael Clauser, who was specially trained as a commercial vehicle enforcement officer, came to the scene. Officer Clauser did not believe the citations were supported. According to Officer Clauser, the truck did not need extended mirrors, extended mirrors would create safety problems, and a mirror violation was not a proper basis for taking a vehicle out of service. Additionally, although a pilot car was required on the "brown" route where the load was initially stopped, the truck would not need a pilot car if the truck was allowed to travel an additional 200 feet to Highway 78 from the place where Officer Barr detained it. The truck driver ultimately pled guilty to the mirror violation, and the pilot car violation was dismissed. A $50 suspended fine was imposed.

After the stop, Officer Clauser and Officer Barr discussed the issue of mirror violations. Officer Clauser told Officer Barr (who was not a trained commercial vehicle enforcement officer) that he was wrong to require a truck driver with an extra-wide load permit to have extended mirrors.

*Grassilli Files Civil Action Against Officer Barr and Sergeant Toth*

Three months after the July 1999 stop, Grassilli filed a civil rights complaint in the superior court against Officer Barr and Sergeant Toth. Officer

Barr thereafter frequently followed Grassilli around town in his patrol vehicle, acting "like he was going to . . . pull [him] over. . . ." Officer Barr would drive by and glare at Grassilli. This conduct made Grassilli feel angry and nervous.

Sergeant Toth retired in July 2000, and Sergeant Neumann became Officer Barr's direct supervisor.

*October 2000 "Cigarette Incident"*

In October 2000, while the first trial was pending, Grassilli stopped at a light across the street from where Sergeant Neumann and Officer Barr were issuing a ticket to another motorist. Officer Barr told Sergeant Neumann he saw Grassilli throw a cigarette out of the window. Sergeant Neumann did not observe what happened. Although Officer Barr wanted to cite Grassilli at that moment, Sergeant Neumann told Officer Barr to remain where he was and that he could file a complaint against Grassilli with the district attorney. Officer Barr thereafter filed a complaint with the district attorney's office, alleging that Grassilli had committed three separate violations: (1) throwing a cigarette; (2) failing to proceed on a green light; and (3) impeding traffic. The court found Grassilli guilty of all three counts. At the current trial, Grassilli denied that he committed any of these offenses, although he admitted that he "flipped [Officer Barr] off."

*January 2001 Tibbans Truck Stop*

In January 2001, several weeks before the trial was scheduled to begin, Officer Barr stopped another Tibbans truck that was following Grassilli to a jobsite. Officer Barr told the driver the truck was in violation of the law because the mirrors were not extended. Officer Thetford was called to the stop to assist Officer Barr. Officer Thetford found the driver had good vision with the mirrors and could see behind the vehicle. Officer Barr gave the driver a citation for not having extended mirrors, and would not allow the truck driver to continue without extending the mirrors. A court commissioner later found the truck driver guilty of the mirror violation and placed him on a one-year probation with a suspended $50 fine.

*Trial Ends in Defense Verdict and Tibbans Terminates Relationship with Grassilli*

The next month, the trial on Grassilli's civil rights claims against Sergeant Toth and Officer Barr resulted in a defense verdict.

At about this same time, James Tibbans told Grassilli he did not want his trucks coming into Ramona anymore because of the additional costs resulting

from the CHP stops. In addition to the three Tibbans truck stops discussed above, Officer Barr regularly detained Tibbans's trucks. On at least 10 occasions, the trucks were detained by Officer Barr, but not ticketed. When Officer Barr made these stops, he would frequently ask if the load was going to Grassilli's work site. If the truck was not associated with Grassilli, Officer Barr would permit the truck to continue. Tibbans testified he thereafter discontinued doing business with Grassilli because he "couldn't afford to have my trucks in Ramona anymore ﹒ . . [b]ecause they were being stopped on a regular basis, and it was costing me a lot of money." Tibbans testified that his Ramona-bound trucks were not stopped for equipment violations in other parts of the state, and that he had received conflicting orders from CHP officers outside Ramona that the mirrors should *not* be extended. Because of the loss of this supplier, Grassilli ultimately stopped selling tanks and changed his business to installing and servicing water pumps, which reduced his profits and required more physical labor and time, leaving less time for his family.

*May 2002 Appellate Decision*

In May 2002, this court reversed the judgment in the first trial, determining the trial court prejudicially erred in refusing to permit any evidence of the stops of the Tibbans trucks. (*Grassilli I, supra,* D037942.) We held that although the evidence was not relevant to Grassilli's claims that the stops violated his Fourth or Fifth Amendment rights, the evidence was relevant to Grassilli's claims that defendants retaliated against him for exercising his right to complain about Officer Barr. We held the retrial was to be limited to Grassilli's section 1983 retaliation and related conspiracy claims against the named defendants (Officer Barr and Sergeant Toth).

*Officer Barr's August 2002 Traffic Stops of Grassilli*

Three months later, Officer Barr drove past Grassilli's vehicle, and then made a U-turn and ordered Grassilli to pull over. Officer Barr told Grassilli he was stopping him for not wearing a seatbelt. He also cited Grassilli for not having a motor carrier identification number and not having a registration tab on the front license plate. The evidence showed Officer Barr was not qualified to issue tickets relating to motor carrier identification numbers because he had not received the requisite training. Grassilli pled guilty to the seatbelt charge. The remainder of the citation was dismissed in connection with an unrelated case against Grassilli for having started a fire on his property to burn bulldozed materials without a permit. No fine was imposed.

One week later, Officer Barr stopped Grassilli while Grassilli was driving his El Camino vehicle home from a car show. Officer Barr gave Grassilli a

citation for misdemeanor violations of failing to correct smog equipment violations and windshield obstruction violations. He issued these citations even though Officer Barr admitted he knew both prior citations had been dismissed by the court and/or signed off by an officer. A "failure to correct" citation is improper if the officer knows the underlying violations have been dismissed. On the ticket, Officer Barr wrote "Ramona" as Grassilli's address instead of Santa Ysabel, which was the basis for Grassilli's assertion that the vehicle was exempt from smog equipment regulations. The court later dismissed the citations in connection with the unrelated fire case.

*January 2003 Complaint*

In January 2003, while the retrial was pending on Grassilli's civil rights case against Officer Barr and Sergeant Toth, Grassilli filed a second civil rights action, naming Officer Barr and Sergeant Neumann as defendants based on the events occurring after the first trial (e.g., the additional Tibbans truck stops and Officer Barr's continued vehicle stops of Grassilli's vehicles). The complaint alleged Sergeant Neumann was liable for his own retaliatory acts and for his failure to properly supervise Officer Barr. The court thereafter consolidated Grassilli's first and second actions.

In February 2003, Officer Clauser had a meeting with his supervisor, Sergeant Mark Crofton, regarding mirror requirements on trucks carrying permitted extra-wide loads. After the meeting, Sergeant Crofton ordered Officer Barr to "cease and desist" writing mirror tickets.

*April 2004 Trial*

The second trial was held in April 2004. During the five-week trial, Grassilli called numerous witnesses who testified to the events set forth above. Grassilli also called two CHP officers, Officer Thetford and Officer Clauser, who provided testimony favorable to Grassilli.

Officer Thetford, another Ramona resident officer, testified about Sergeant Toth's plan to impound Grassilli's vehicle. He also said both Sergeant Toth and Sergeant Neumann told him not to associate with Grassilli because Grassilli had filed a citizen's complaint and a lawsuit, and that Officer Thetford's continued association with Grassilli would detrimentally affect his career. Officer Thetford also testified at length about the conduct of his CHP supervisors, including Sergeant Crofton (who was the defense expert at trial), in pressuring him to change his deposition testimony in the case and retaliating against him for testifying in Grassilli's favor.

Officer Clauser, one of two CHP officers trained as commercial enforcement officers in the Ramona area, testified about his observations of the July

1999 Tibbans truck stop and his opinion the truck did not require extended mirrors, a fact he communicated to Officer Barr. Officer Clauser also testified about the meeting at which his supervisor, Sergeant Crofton, ordered Officer Barr to stop writing mirror violation tickets to Grassilli, and that Sergeant Crofton later put pressure on Officer Clauser not to provide deposition testimony favorable to Grassilli.

Additionally, Grassilli presented the testimony of two expert witnesses (Jack Smith and Ronald Sealey). Jack Smith, a former El Cajon police chief who had held various internal affairs and training positions with the Los Angeles Police Department and the San Diego County Sheriff's Department, testified that Officer Barr violated applicable rules by repeatedly writing traffic citations to Grassilli for violations that had been dismissed by the court and by treating the trucks going to Grassilli's work site differently from other trucks. Smith also opined that Sergeant Toth's handling of Grassilli's complaint violated CHP procedures, and that Sergeant Toth's conduct in precluding his officers from notifying Grassilli of the registration violation before the impound date was "[a]bsolutely wrong" and "ridiculous" under any circumstances. Smith further testified that Sergeant Neumann "neglected" his supervisory duties with respect to Officer Barr, and Sergeant Neumann's instruction to Officer Thetford not to associate with Grassilli was "misconduct of the most serious kind" because it "smacks of the blue veil," which is "that you don't tell the truth, that you side together."

Grassilli's other expert witness, Ronald Sealey, who worked as a San Diego County Sheriff's deputy for 18 years, opined that a timeline of the stops "indicated a pattern of selective enforcement." Sealey noted that Officer Barr was the only officer citing Grassilli and the Tibbans work trucks for equipment violations despite that numerous other officers observed these vehicles. Sealey further testified that the CHP manual requires that an officer be certified to conduct under-the-hood inspections for smog violations, and that Officer Barr improperly "stacked" tickets given to Grassilli, which means "adding violations of the same nature under different [Vehicle Code] sections." With respect to the Tibbans truck stops, Sealey opined that Officer Barr was wrong about requiring the truck mirrors to be extended beyond an extra-wide load. He explained that an extension would violate Tibbans's Caltrans permit because it would take the truck beyond the permitted 12-foot width. He further testified that the CHP has adopted Commercial Vehicle Safety Alliance (CVSA) rules, which provide that an officer may take a vehicle out of service only for certain violations, and a mirror violation is not one of these violations.

In defense, each defendant testified that the actions taken against Grassilli were motivated by proper law enforcement purposes and not for retaliation.

Defendants additionally called as an expert witness Sergeant Crofton, a supervising officer of the El Cajon CHP office and a trained commercial vehicle enforcement supervisor. Sergeant Crofton opined that Officer Barr's traffic citations to Grassilli were proper, and that Officer Barr's conduct in citing and placing the Tibbans trucks out of service for the lack of extended mirrors was consistent with the Vehicle Code.

*Jury Instructions and Verdict*

At the conclusion of the evidence, the court instructed the jury on Grassilli's single cause of action—a civil rights violation under section 1983. With the parties' agreement, the court instructed the jury that to recover on this claim, Grassilli must prove defendants intentionally retaliated against him for complaining about Officer Barr's illegal conduct, and that the retaliation was the "decisive factor, in the absence of which [defendants] would not have acted as [they] did." The jury was further instructed that if Grassilli proved this nexus, then Grassilli could establish his claim "even if the act, when taken for a different reason, would have been proper." This instruction was qualified by an additional instruction applicable to the two instances when a prosecutor was involved in the decision to bring charges against Grassilli (the Pen. Code, § 148.6 charges for making a false complaint against an officer and the October 2000 cigarette incident charges). With respect to these incidents, the court instructed the jury it was required to presume defendants' conduct did not cause any injury to Grassilli, but this presumption could be rebutted by evidence that Officer Barr knowingly gave false information to the prosecutor.

During deliberations, the jurors sent a note asking for direction because one juror was refusing to deliberate. After the court questioned the juror outside the presence of the other jurors and the juror asked to be excused, both counsel agreed that the court should grant the juror's request. The court then placed an alternate juror on the panel and instructed the jury to begin deliberations anew.

One day later, the jury reached a verdict, finding: (1) Sergeant Toth and Officer Barr retaliated against Grassilli; (2) Sergeant Neumann did not personally retaliate against Grassilli; (3) Sergeant Toth and Sergeant Neumann were liable for the retaliation in their role as supervisory officers; and (4) Sergeant Toth and Officer Barr acted "maliciously, wantonly, or oppressively against [Grassilli]." The jury awarded Grassilli compensatory damages of $357,000 against Officer Barr; $133,000 against Sergeant Toth; and $20,000 against Sergeant Neumann.

During the punitive damage phase, Grassilli did not present any additional evidence, and each defendant presented evidence only of his financial condition. After a brief deliberations period, the jury awarded $3 million against Officer Barr and awarded $1,005,522 against Sergeant Toth.

## DISCUSSION

### I. *Sufficiency of the Evidence*

"[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers" (*Houston v. Hill* (1987) 482 U.S. 451, 461 [96 L.Ed.2d 398, 107 S.Ct. 2502]), and retaliation for this criticism is actionable as a civil rights violation under section 1983. (*Greene v. Barber* (6th Cir. 2002) 310 F.3d 889, 895; *Smart v. Board of Trustees of University of Illinois* (7th Cir. 1994) 34 F.3d 432, 434; *Rakovich v. Wade* (7th Cir. 1988) 850 F.2d 1180, 1211; *Elbrader v. Blevins* (D.Kan. 1991) 757 F.Supp. 1174, 1183.) "Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right' [citation], and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . ." (*Hartman v. Moore, supra,* 126 S.Ct. at p. 1701 (*Hartman*).)

Defendants do not challenge these well-settled principles, but argue that insufficient evidence supported the jury's findings that they retaliated against Grassilli. In examining this contention, we consider the evidence in the light most favorable to the prevailing party, accept as true all the evidence and reasonable inferences tending to establish the correctness of the jury's findings, and resolve every conflict in favor of the judgment. (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630–631 [85 Cal.Rptr.2d 386].) " 'It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact. Our authority begins and ends with a determination as to whether, on the entire record, there is *any* substantial evidence, contradicted or uncontradicted, in support of the judgment.' " (*Baxter Healthcare Corp. v. Denton* (2004) 120 Cal.App.4th 333, 369 [15 Cal.Rptr.3d 430].)

#### A. *Substantial Evidence Supported the Retaliation Findings*

Defendants first contend the evidence was insufficient to show Sergeant Toth and Officer Barr acted with the intent to retaliate. This contention is without merit.

As detailed above, Officer Barr stopped Grassilli for alleged equipment violations shortly after Grassilli complained about Officer Barr's unlawful

conduct. He then continued to stop Grassilli for these violations despite knowing a court had dismissed the violations, and/or that Grassilli had corrected the violations. Officer Barr additionally targeted only the trucks that were delivering materials to Grassilli's work site for alleged mirror violations. Officer Barr took the trucks out of service, delayed them for hours, and required them to have extended mirrors, despite knowing that a more experienced colleague told him he was wrong to do so. Officer Barr stopped many other Tibbans trucks, but released each truck upon learning the driver was not headed to a Grassilli work site. Officer Barr also initiated and then was actively involved in Sergeant Toth's plan to impound Grassilli's vehicle. Grassilli's expert witnesses criticized Officer Barr's actions as unprofessional, unwarranted, and violative of CHP policy.

For years, no CHP officer in Ramona took any action against Grassilli for the condition of his El Camino car, although these officers frequently observed Grassilli driving this vehicle through town. Within weeks of Grassilli's complaint, Officer Barr began to cite Grassilli, detain commercial vehicles hauling his water tanks, and then set in motion a scheme that led to the impound of Grassilli's truck. The jury found the nature and timing of these actions to be much more than a mere coincidence. There was substantial evidence for the jury to reach this conclusion. Viewing the totality of the circumstances, the evidence supports a finding that the stops were not triggered merely by Officer Barr's proper attempts to enforce the law.

Similarly, Sergeant Toth's actions in impounding Grassilli's vehicle and ordering the other officers not to provide Grassilli the opportunity to timely fix the problem supports the jury's finding that Sergeant Toth acted with a retaliatory motive. CHP policy requires officers to give a citizen a "notice to correct" if the officer is aware of a registration problem before the six-month period has expired. Sergeant Toth admitted he knew of this policy and he had never previously violated the policy, but did not offer a reasonable explanation for why he did so with Grassilli. Grassilli's experts opined that Sergeant Toth's actions were improper, unethical, and tantamount to targeting.

In challenging the sufficiency of evidence, defendants contend the evidence showed their contacts with Grassilli were motivated solely by a desire to enforce the law. Although the jury could have accepted this argument, it did not. Moreover, in asserting this argument, defendants neglect to provide a reasoned discussion of all of the evidence, which includes Grassilli's evidence. Rather than analyzing Grassilli's evidence and demonstrating it does not prove retaliation, defendants simply cite to their own favorable testimony. On appeal, we begin with the presumption that the record contains evidence sufficient to support the judgment. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].) It is the appellant's burden

to demonstrate otherwise. The appellant's brief must set forth all of the material evidence bearing on the issue, not merely the evidence favorable to the appellant, and it also must show how the evidence does not sustain the challenged finding. (*Ibid.*; *Niederer v. Ferreira* (1987) 189 Cal.App.3d 1485, 1510 [234 Cal.Rptr. 779].) Where, as here, the appellant fails to set forth all of the material evidence, a claim of insufficiency of the evidence fails.

### B. *Substantial Evidence Supported the Malice Findings*

For similar reasons, we reject defendants' arguments that insufficient evidence supported the jury's finding that Sergeant Toth and Officer Barr acted "maliciously, wantonly, or oppressively" against Grassilli.

As set forth above, the evidence established that Grassilli brought a complaint through proper channels pertaining to the propriety of Officer Barr's personal conduct, and that in retaliation for the complaint, Sergeant Toth and Officer Barr intentionally targeted Grassilli over several years and used their law enforcement authority to penalize Grassilli for his decision to make this complaint. This evidence substantially supports the jury's finding that the officers acted with the requisite malice.

In challenging the jury's malice findings, defendants deny they "harbor[ed] any intent to retaliate against respondent at any time . . . ." Defendants claim the tickets issued by Officer Barr reflect nothing more than his "unyielding effort to protect the motoring public and make the highways safe" and to "aggressively, but fairly enforce the Vehicle Code." They similarly argue that Sergeant Toth's decision to wait six months to impound Grassilli's vehicle without giving him any warning was motivated solely by Sergeant Toth's "hope" that Grassilli "would properly register the truck and pay the applicable DMV fees," and therefore "[s]uch a 'goodwill' posture and act of leniency . . . simply cannot be the factual basis for a finding of malice, oppression or fraud."

Although these contentions may be legitimate arguments to be made to a jury, they do not create a basis for overturning a jury's findings on appeal. The jury rejected defendants' view of the evidence that the officers were merely performing their obligations to enforce the Vehicle Code and thus were not acting with malicious intent, and the jury had a substantial evidentiary basis to do so.

### C. *Substantial Evidence Supports Supervisory Liability*

Defendants also challenge the sufficiency of the evidence to support supervisory liability against Sergeant Toth and Sergeant Neumann. To establish supervisory liability under section 1983, Grassilli was required to prove:

(1) the supervisor had actual or constructive knowledge of Officer Barr's wrongful conduct; (2) the supervisor's response " 'was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices" ' "; and (3) the existence of an " 'affirmative causal link' " between the supervisor's inaction and Grassilli's injuries. (*Weaver v. State of California* (1998) 63 Cal.App.4th 188, 209–210, fn. 6 [73 Cal.Rptr.2d 571], quoting *Shaw v. Stroud* (4th Cir. 1994) 13 F.3d 791, 799.) The jury was properly instructed on these elements, and found in Grassilli's favor on each of them.

The evidence supports these findings. By personally participating in the retaliatory activities, Sergeant Toth had actual knowledge that Officer Barr was engaged in retaliatory conduct against Grassilli. Sergeant Toth not only failed to direct Officer Barr to refrain from his activities, he supported and encouraged them. Additionally, the evidence showed that Sergeant Toth was aware that Officer Barr continued to cite Grassilli for smog violations despite the court's dismissal of the charge, but he took no action to counsel Officer Barr or discourage this conduct.

The evidence likewise showed that Sergeant Neumann was aware of the history of conflict between Grassilli and Officer Barr, and yet continued to permit Officer Barr to issue Grassilli questionable citations. Grassilli's expert witness, Smith, a former police chief with substantial internal affairs experience, opined that Sergeant Neumann "neglected" his supervisorial duties at the December 1998 stop by permitting Officer Barr to issue a ticket that was inconsistent with CHP policy, and that he encouraged the retaliatory enforcement activities taken against Grassilli. Smith stated that Sergeant Neumann's responsibilities were to defuse the conflict between Officer Barr and Grassilli, rather than to "exacerbate" the problem. Smith also stated that Sergeant Neumann should have made a determination whether Officer Barr's personal opinion as to the smog violations was supported by CHP policy. Smith opined that Sergeant Neumann also showed tacit support for Officer Barr's actions by improperly taking disciplinary actions against Officer Thetford for associating with Grassilli and for Officer Thetford's truthful testimony in the prior proceedings.

## II. *Probable Cause Element*

In their reply brief, defendants argue for the first time that the judgment must be reversed because Grassilli did not prove a lack of probable cause for the traffic stops. They rely on a recent United States Supreme Court decision, decided after the parties filed their initial appellate briefs, which interpreted the requirements of a federal civil rights retaliatory prosecution claim against

federal and state officials. (*Hartman, supra,* 126 S.Ct. 1695.)[5] For the reasons explained below, we find no reversible error.

In *Hartman,* the plaintiff brought a retaliatory prosecution claim against postal inspectors who allegedly engineered his criminal prosecution in retaliation for criticism of the postal service. (*Hartman, supra,* 126 S.Ct. at p. 1700.) The Supreme Court granted certiorari to resolve a conflict among the federal circuits as to whether "a plaintiff in a retaliatory-prosecution action must plead and show the absence of probable cause for pressing the underlying criminal charges." (*Id.* at pp. 1701–1702.) In considering this issue, *Hartman* first reaffirmed the general rule that a plaintiff claiming retaliation against a federal or state official must generally prove a "but-for" causal connection between the unconstitutional motive and the alleged improper action, and, if this nexus is shown, the plaintiff need not prove any additional specific evidentiary link, such as the lack of objective circumstances supporting the official's action. (*Id.* at pp. 1703–1704.) In other words, where constitutionally protected speech is a motivating factor in governmental action adverse to the plaintiff, the adverse action is actionable even if there were other objective grounds for the action, unless the same action would have been taken even in the absence of the protected conduct. (See *Mt. Healthy City Board of Ed. v. Doyle* (1977) 429 U.S. 274, 285–287 [50 L.Ed.2d 471, 97 S.Ct. 568].)

After reaffirming this general rule, the *Hartman* court discussed the need for a stricter causation rule for a "retaliatory *prosecution*" claim because the claim differ[s]" from the "standard" retaliation case in two ways. (*Hartman, supra,* 126 S.Ct. at p. 1704, italics added.) First, the court stated that the probable cause issue is typically part of a retaliatory prosecution case, and thus imposing the obligation on a plaintiff to prove its absence would not create a significant additional burden for the plaintiff. (*Ibid.*) But more important to its decision, the court identified the unique causation issues inherent in a retaliatory prosecution case and found these issues make it appropriate that a plaintiff prove a stronger nexus between the alleged retaliatory actions and the resulting harm. (*Id.* at pp. 1704–1705.) The court explained that the decision to prosecute is made by an independent prosecutor (who is entitled to absolute immunity for the decision) rather than the person alleged to have been motivated by retaliation. (*Id.* at pp. 1704–1706.) Thus, "the causal connection required . . . is not merely between the retaliatory animus of one person and that person's own injurious action, but between the

---

[5] Although *Hartman* involved a *Bivens* suit against federal officials (*Bivens v. Six Unknown Fed. Narcotics Agents* (1971) 403 U.S. 388 [29 L.Ed.2d 619, 91 S.Ct. 1999]), the Supreme Court made clear its analysis and holding applied equally to a section 1983 claim against a state official or employee. A *Bivens* action is the federal analog to suits brought against state officials under section 1983. (*Hartman, supra,* 126 S.Ct. at p. 1700, fn. 2.)

retaliatory animus of one person and the action of another." (*Id.* at p. 1705.) The court also emphasized the "long-standing" presumption that a prosecutor has legitimate grounds for actions taken, and therefore "judicial intrusion into executive discretion of such high order should be minimal." (*Id.* at pp. 1705–1706.) To avoid the factual and legal difficulties inherent in the complex causation analysis in a retaliatory prosecution case and to give effect to the strong judicial deference accorded to prosecutorial decisionmaking, *Hartman* thus established a bright line rule holding that a plaintiff alleging a *retaliatory prosecution* claim must prove, as an element of the case, there was no probable cause for the prosecution. (*Id.* at p. 1707.)

*Hartman* is inapplicable to Grassilli's claims based on the traffic stops and citations because these claims and the damages sought were not based on criminal charges brought by a third party or entity against Grassilli. The damages for these claimed retaliatory actions were incurred because of the stops themselves, not necessarily the later prosecution. Further, as acknowledged by defense counsel at trial, a traffic citation constitutes the charging document and triggers a traffic proceeding without any prosecutorial decision-making, and therefore there is no presumption that the prosecutor has "broken the causal chain" between the defendant's conduct and the damages. The logic of the *Hartman* decision does not apply if a plaintiff's claim is based on the defendants' retaliatory actions without the involvement of a prosecutorial agency (or similar charging entity) and the damages incurred were independent of the prosecution.

In so concluding, we recognize that a federal district court recently held *Hartman*'s probable cause requirement applied to a retaliatory *arrest* claim— even where there were no criminal charges brought. (*Hansen v. Williamson* (2006) 440 F.Supp.2d 663, 676.) We find the reasoning of that decision unpersuasive. Despite its broad language, *Hartman* made clear that it was imposing the lack-of-probable-cause element with respect to retaliatory prosecution claims because of the unique causation analysis arising when the charges are brought based on the decision of a third party prosecutor (or other similar entity).[6]

---

[6] *Hansen* relied on *Barnes v. Wright* (6th Cir. 2006) 449 F.3d 709, which is factually distinguishable. *Barnes* held *Hartman*'s lack-of-probable-cause requirement applied to a retaliatory prosecution case where no prosecutorial agency was involved, and instead the officers with the alleged retaliatory motives "themselves initiated the grand jury proceedings against [the plaintiff]." (*Id.* at p. 720.) We agree with the *Barnes* court's conclusion that the *Hartman* rule applied under those circumstances. Because the grand jury performed a role similar to a prosecutor (made the independent decision to issue an indictment based on its conclusion there was a sufficient basis to bring the criminal action), the case was functionally the same as a retaliatory prosecution claim.

Although not specifically argued by defendants, we note there were two aspects of Grassilli's case that were based on an alleged retaliatory prosecution arising from the district attorney's decision to bring the charges: (1) the Penal Code section 148.6 charges brought against Grassilli for filing a false complaint, and (2) the charge arising from the October 2000 cigarette incident. With respect to these specific incidents, the jury was instructed that once a prosecutor makes an independent decision to prosecute a crime, "the causal chain between the defendants' alleged misconduct and the criminal prosecution is [presumed to be] broken," unless Grassilli established defendants knowingly provided the district attorney with false information.

This instruction was arguably insufficient because it did not include a specific statement that Grassilli must prove a lack of probable cause for the prosecutions. However, defendants waived the right to assert instructional error by failing to raise it in the proceedings below or in their opening appellate brief. Although *Hartman* was decided after the second trial in this case, at the time of trial there was a split in the federal circuits as to whether a plaintiff is required to show a lack of probable cause in a retaliatory prosecution suit. (Compare *Moore v. Hartman* (D.C. Cir. 2004) 363 U.S. App.D.C. 350 [388 F.3d 871, 879] [no probable cause requirement]; *Poole v. County of Otero* (10th Cir. 2001) 271 F.3d 955, 961 [no probable cause requirement]; with *Wood v. Kesler* (11th Cir. 2003) 323 F.3d 872, 883 [probable cause required]; *Keenan v. Tejeda* (5th Cir. 2002) 290 F.3d 252, 260 [probable cause required]; *Mozzochi v. Borden* (2d Cir. 1992) 959 F.2d 1174, 1179–1180 [probable cause required].) Defendants thus had full opportunity to raise the issue, relying on the authorities favoring their position. Not only did they fail to raise the issue, they agreed that the jury should be instructed that it could find in Grassilli's favor on the retaliation claim based on the false charges and cigarette incident, if Grassilli proved the officers gave false information to the prosecutor. Further, defendants have never—including in their reply brief filed after *Hartman* was decided—challenged the correctness of any of the jury instructions on the causation or other liability issues, nor did they include the jury instructions as part of the designated appellate record. Under these circumstances, defendants waived the argument that insufficient evidence supports the judgment because Grassilli failed to prove a lack of probable cause.

Moreover, defendants have not met their burden to show reversible error. We are required to imply all necessary findings in support of the jury verdict, and there was substantial evidence from which the jury could find the prosecutor did not have probable cause to bring the Penal Code section 148.6 charge against Grassilli. The criminal charges against Grassilli were dismissed for lack of evidence, and Grassilli produced substantial evidence

showing the charges were objectively baseless because the evidence showed Grassilli was truthful when he communicated his concerns about Officer Barr's vehicle.

Additionally, the central thrust of Grassilli's claims and the damages sought did not center on Grassilli's claims that he was the victim of a retaliatory *prosecution*. Instead, his claims were that as a result of his exercise of his First Amendment rights, the law enforcement officers took adverse actions against him—which included repeated traffic stops, impounding of his vehicle, and stops of his delivery trucks. It was the stops themselves, rather than a prosecution by an independent prosecutorial authority, that caused the bulk of his alleged damages. Although Grassilli did present evidence that he incurred attorney fees of $9,750 to defend against the criminal charges, it is not clear whether the jury included this amount in its economic damages finding of $210,000. On our review of the record, it is not likely the outcome would have been different if the jury had been instructed regarding the probable cause requirement with respect to the damages awarded for the two prosecutions brought by the district attorney's office.

III., IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## V. *Punitive Damages*

### A. *Relevant Factual and Procedural Background*

Before the punitive damages phase, defendants notified the court they intended to produce evidence of their financial conditions, and proposed a jury instruction stating the jury "may" consider this evidence in determining the appropriate punitive damages award. Grassilli's counsel agreed the defendants had the right to present financial condition evidence, but objected to the proposed instruction because federal, not state, law applied. Grassilli's counsel requested that the court use instruction No. 7.5 of the Ninth Circuit's manual on model jury instructions which does not mention financial condition evidence. (9th Cir. Civ. Jury Instr. 7.5 (2001).)[9] Grassilli's counsel also asserted that if defendants submitted their financial evidence, he should be

---

*See footnote, *ante*, page 1260.

[9] The model instruction states in relevant part: "The purposes of punitive damages are to punish a defendant and to deter a defendant and others from committing similar acts in the future. [¶] . . . [¶] If you find that punitive damages are appropriate, you must use reason in setting the amount. Punitive damages, if any, should be in an amount sufficient to fulfill their purposes but should not reflect bias, prejudice or sympathy toward any party. In considering punitive damages, you may consider the degree of reprehensibility of the defendant's conduct

permitted to ask defendants whether they were entitled to be indemnified by the state for a punitive damages award under Government Code section 825.[10]

After considering these arguments, the court ruled: (1) it would permit defendants to produce evidence of their financial conditions; (2) it would give Grassilli's proposed federal model punitive damage instruction that did not specifically refer to the financial condition evidence; and (3) it would not permit Grassilli to introduce evidence pertaining to Government Code section 825 relating to the possibility of indemnification.

The only evidence presented during the ensuing punitive damages phase was the testimony of Officer Barr and Sergeant Toth concerning their financial resources. Neither officer was cross-examined. Officer Barr testified that his gross salary as a CHP officer is approximately $5,000 per month, and his wife earns a gross monthly salary of about $4,000. Their total monthly expenses are $6,700. The couple has three children under the age of 13, and they own their home with a fair market value of about $410,000, encumbered by a first and second mortgage totaling $370,000. Officer Barr has approximately $8,000 in bank accounts, a retirement account of $6,500, and three vehicles, two on which he is making payments. Officer Barr has no other investments or income sources.

Sergeant Toth testified that he has been retired since July 2000, and he receives approximately $60,000 in annual retirement income. He has retirement accounts of approximately $55,000, and a checking/savings account of

---

and the relationship of any award of punitive damages to any actual harm inflicted on the plaintiff." (9th Cir. Civ. Jury Instr. 7.5, *supra*.)

[10] Government Code section 825, subdivision (b), provides that a public entity may pay for a compensatory damages award against an employee acting within the scope of his or her employment, but a public entity is *not* authorized to pay a punitive damages award *unless "the governing body of [the] public entity . . . finds all of the following:* [¶] (1) The judgment is based on an act or omission of an employee or former employee acting within the course and scope of his or her employment as an employee of the public entity. [¶] (2) *At the time of the act giving rise to the liability, the employee or former employee acted, or failed to act, in good faith, without actual malice and in the apparent best interests of the public entity.* [¶] (3) Payment of the claim or judgment would be in the best interests of the public entity. [¶] As used in this subdivision with respect to an entity of state government, 'a decision of the governing body' means the approval of the Legislature for payment of that part of a judgment that is for punitive damages or exemplary damages, upon recommendation of the appointing power of the employee or former employee, based upon the finding by the Legislature and the appointing authority of the existence of the three conditions for payment of a punitive or exemplary damages claim." (Italics added.) Section 825, subdivision (b) further states that "[t]he possibility that a public entity may pay that part of a judgment that is for punitive damages shall not be disclosed in any trial in which it is alleged that a public employee is liable for punitive or exemplary damages, and that disclosure shall be grounds for a mistrial."

about $10,000. Sergeant Toth estimated his monthly expenses to be approximately $3,300. Sergeant Toth owns a home with a fair market value of approximately $400,000, and owes $135,000 on the mortgage, and owns rental property with a value of approximately $200,000 and a loan balance of $72,000. He earns approximately $30 per month from the rental property.

During his closing argument, Grassilli's counsel urged the jury to "send a message" and to award an amount sufficient to insure defendants would be held accountable for their breach of trust. He reminded the jury of CHP management's complicity in promoting an environment that obfuscates the truth and called upon the jury to act as the conscience of the community and to "reform the process." Although deferring to the jury, counsel maintained that nothing less than a "small fortune" would deter future conduct and suggested such figures as $7 million or a 10-to-1 ratio.

In response, defense counsel argued that punitive damages were not warranted as Grassilli had been handsomely rewarded and had been "made whole" by the compensatory damages award. He stressed that "these two individuals are not responsible for reforming the California Highway Patrol" and rejected the view that the jury should "hold these two individuals out to cause a reform." In an apparent attempt to suggest the officers were responsible for paying the compensatory damages award, defense counsel also stated the officers "are going to be punished handsomely with having to write a check . . . ." Grassilli's counsel interrupted and objected on the basis of "[m]isstatement of the law." The court sustained the objection.

In his rebuttal, Grassilli's counsel focused on defendants' testimony regarding their limited financial resources and suggested a defendant's financial condition was of no relevance in setting punitive damages: "[s]trap out [defense counsel's] argument, I have no money, therefore, don't hold me accountable. I have no money, therefore, don't punish me. The law doesn't say that. [¶] Here is the law: punitive damages doesn't talk about 'I have no money, so don't punish me.' But that's what they're saying. [¶] And what kind of message would that say to other officers? [¶] Let's just embrace his argument. They have no money, so give them $50,000 or less. If I'm a law enforcement [officer] and I want to get by with this, I bankrupt myself and put it all in my wife's name. 'I have no money. You can't touch me. I have no money.' [¶] Folks, that's just not right. This is a case that they never said they're sorry, once. They . . . fail[ed] to accept responsibility in this here. [¶] What have we heard? [¶] Nothing, 'Don't hurt me. I have no money.' [¶] The flip side is, I have no money. You can't hurt me."

After a brief deliberations period, the jury awarded approximately $4 million in punitive damages: $3 million against Officer Barr and $1,005,522 against Sergeant Toth.

## B. *Analysis*

Defendants contend the punitive damages award is excessive and violates their due process rights. They also contend the court erred in failing to instruct the jury that their financial condition was relevant in determining the appropriate amount of punitive damages to be awarded. They claim this failure was particularly prejudicial because of Grassilli's counsel's argument suggesting the jury should not consider defendants' financial condition in determining the appropriate amount of punitive damages. For the reasons explained below, we conclude that the amount of the award is excessive on constitutional and nonconstitutional grounds.

### 1. *Constitutional Limits*

■ Punitive damages advance important state interests of deterrence and retribution. (*State Farm Mut. Automobile Ins. Co. v. Campbell* (2003) 538 U.S. 408, 416 [155 L.Ed.2d 585, 123 S.Ct. 1513] (*State Farm*).) The due process clause, however, "prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor. . . . '[E]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.' " (*Id.* at pp. 416–417.) Thus, "[t]o the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." (*Id.* at p. 417.)

■ To determine the constitutional limits of a punitive damages award in any given case, a court examines three "guideposts" articulated by the United States Supreme Court: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." (*State Farm, supra,* 538 U.S. at p. 418, citing *BMW of North American, Inc. v. Gore* (1996) 517 U.S. 559, 575 [134 L.Ed.2d 809, 116 S.Ct. 1589]; *Gober v. Ralphs Grocery Co.* (2006) 137 Cal.App.4th 204, 215 [40 Cal.Rptr.3d 92] (*Gober*).)

We apply a de novo review and independently assess these factors. (*Cooper Industries, Inc. v. Leatherman Tool Group, Inc.* (2001) 532 U.S. 424, 436 [149 L.Ed.2d 674, 121 S.Ct. 1678]; *Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1172 [29 Cal.Rptr.3d 379, 113 P.3d 63] (*Simon*).)

Although a jury's underlying findings and determinations as to the extent and cause of the plaintiff's injury are factual determinations, "a punitive damages award is not a finding of fact, but rather an expression of moral condemnation." (*Gober, supra,* 137 Cal.App.4th at p. 212.)

Under these principles, we conclude the $3 million and approximately $1 million punitive damages awards exceed constitutional limits.

*Reprehensibility*

██ Abuse of authority by a law enforcement officer is reprehensible and punitive damages awards "serve a critical role in deterring such misconduct." (*DiSorbo v. Hoy* (2d Cir. 2003) 343 F.3d 172, 188.) To protect society, we give law enforcement officers great power, but do so with the expectation that they will use this authority properly. Any breach of that trust is a serious matter deserving of a substantial monetary sanction that will meaningfully punish the defendant and serve to assure that the officer (as well as other law enforcement officers) will never again engage in similar conduct.

However, it is the degree of the reprehensibility, not its existence in an absolute sense, that is the critical factor in evaluating whether a damages award withstands constitutional scrutiny. (*State Farm, supra,* 538 U.S. at p. 419.) The United States Supreme Court has cautioned that the totality of the circumstances must be considered in determining the level of reprehensibility and has observed that a defendant's conduct—even where repetitive acts are involved—may be less culpable for purposes of punitive damages if the conduct caused no physical harm and did not otherwise detrimentally affect the plaintiff's health or safety. (*Ibid.*) That is the case here.

The jury found Officer Barr and Sergeant Toth repeatedly abused their law enforcement authority and used the power of the state for the purpose of retaliating against Grassilli for exercising his constitutional rights. This conduct was wrong and inexcusable. However, Grassilli was never physically assaulted, imprisoned or otherwise physically mistreated or abused, or threatened with such mistreatment. The harm Grassilli suffered was far less serious than suffering caused by the defendants' conduct in other civil rights cases in which the courts have found lesser awards to be constitutionally excessive. (See, e.g., *DiSorbo v. Hoy, supra,* 343 F.3d 172 [police officer used excessive force on woman at police station, including slamming her against the wall, choking her, and striking her repeatedly as she lay facedown; court reduced $1.275 million punitive damage award to $75,000]; *Mathie v. Fries* (2d Cir. 1997) 121 F.3d 808, 810, 817 [prisoner subject to "horrific" rape and repeated sexual advances by corrections officer who engaged in " 'an outrageous abuse of power and authority' "; court found $500,000 punitive damages award

constitutionally excessive, reduced award to $200,000].) Moreover, the improper conduct occurred sporadically, rather than on a weekly or even a monthly basis.

Additionally, the reprehensibility factor focuses on the conduct of the defendant, and not on the activities of other individuals or entities who may share the blame. On our review of the record, the amount of the award likely includes the jury's adoption of Grassilli's counsel's argument that the CHP management should be punished for its conduct in encouraging other officers to be less than honest about defendants' wrongful conduct. At oral argument, Grassilli's counsel expressly agreed with this assessment. However, the punitive damages award cannot be constitutionally upheld to the extent it includes an amount to punish the CHP management. In setting the level of punitive damages, a jury may consider the amount necessary to deter the conduct of the defendant and others, but it may not punish a defendant for the wrongful conduct of another person or entity.

*Ratio of Punitive Damages to Actual or Potential Harm*

The second relevant constitutional factor in evaluating whether a punitive award exceeds constitutional limits is the ratio between the compensatory and punitive damages. (*State Farm, supra,* 538 U.S. at p. 425.) "Although this ratio is not 'marked by a simple mathematical formula' (*State Farm, supra,* 538 U.S. at p. 424, citing *TXO Production Corp. v. Alliance Resources Corp.* (1993) 509 U.S. 443, 458 [125 L.Ed.2d 366, 113 S.Ct. 2711]), the United States Supreme Court has decreed that 'few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process' and has cautioned that a 4 to 1 ratio 'might be close to the line of constitutional impropriety.' (*State Farm, supra,* 538 U.S. at p. 425.)" (*Gober, supra,* 137 Cal.App.4th at p. 222.) "Nonetheless, extraordinary factors, such as extreme reprehensibility or unusually small, hard-to-detect or hard-to-measure compensatory damages, may justify punitive damages in excess of a single-digit ratio." (*Ibid.,* citing *State Farm, supra,* 538 U.S. at p. 425; *Simon, supra,* 35 Cal.4th at p. 1182.) On the other hand, "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." (*State Farm, supra,* 538 U.S. at p. 425.)

The award against Sergeant Toth reflected an 8-to-1 ratio, and the award against Officer Barr an 8.5-to-1 ratio. These ratios are close to the upper constitutional limits, and the case does not include the extraordinary factors identified by the Supreme Court as justifying a larger ratio. Defendants did

not cause physical harm, and the compensatory damages were not unusually small, hard to detect, or difficult to measure. Grassilli was fully compensated for his economic damages and received a substantial recovery for his claimed emotional injuries. The high court has recognized that when the compensatory damages award includes a substantial amount of emotional distress damages, there is a danger that this compensation will be duplicated in a punitive damages award, thus calling for a smaller ratio. (*State Farm, supra,* 538 U.S. at p. 426; see Rest.2d Torts § 908, com. c, p. 466 ["In many cases in which compensatory damages include an amount for emotional distress, such as humiliation or indignation aroused by the defendant's act, there is no clear line of demarcation between punishment and compensation and a verdict for a specified amount frequently includes elements of both"].)

### Comparison to Civil Remedies

The final Supreme Court guidepost requires a comparison between the punitive damages award and other civil penalties authorized or imposed in comparable cases. (*State Farm, supra,* 538 U.S. at p. 428.) "The rationale for this consideration is that, if the penalties for comparable misconduct are much less than a punitive damages award, the tortfeasor lacked fair notice that the wrongful conduct could entail a sizable punitive damages award." (*DiSorbo v. Hoy, supra,* 343 F.3d at p. 187.)

■ Under California law, a person who violates another person's constitutional rights may be liable for a maximum of three times the amount of the actual damage suffered. (Civ. Code, §§ 52, subd. (a), 52.1, subds. (a), (b); see *Gatto v. County of Sonoma* (2002) 98 Cal.App.4th 744, 752–753 [120 Cal.Rptr.2d 550].) The 8-to-1 and 8.5-to-1 ratios are substantially higher than this amount. Further, although law enforcement officers are presumed to understand the serious consequences that can occur if the officer misuses his or her law enforcement authority, it is doubtful defendants would have been prepared for a punitive damages award amounting to Officer Barr's entire annual income for 50 years, or Sergeant Toth's entire retirement income for 16 years. (See *Lee v. Edwards* (2d Cir. 1996) 101 F.3d 805, 811.)

### Conclusion on Constitutional Guideposts

After considering the relevant constitutional factors outlined by our high court, we conclude the $3 million award against Officer Barr and the $1 million award against Sergeant Toth exceed constitutional limits. Clearly, defendants' conduct was highly reprehensible. However, it was not sufficiently blameworthy to warrant such high awards. Additionally, the ratio of punitive to compensatory damages raises the potential of duplicative damages and the awards far exceed the treble damages authorized as statutory penalties for civil rights violations.

### 2. *Punitive Damage Award Excessive with Respect to Each Defendant's Ability to Pay*

■ In addition to reviewing the constitutionality of a punitive damages award, an appellate court is obligated to review the award for reasonableness, including whether the award is within the defendant's ability to pay. (*Patterson v. Balsamico* (2d Cir. 2006) 440 F.3d 104, 121–122 (*Patterson*); *Vasbinder v. Scott* (2d Cir. 1992) 976 F.2d 118, 121 (*Vasbinder*); *DiSorbo v. Hoy, supra,* 343 F.3d at p. 189, fn. 9; see also *Newport v. Fact Concerts, Inc.* (1981) 453 U.S. 247, 269–270 [69 L.Ed.2d 616, 101 S.Ct. 2748].) Because the punitive damages award was based solely on a federal civil rights claim, we review the excessiveness claim under federal law applicable to punitive damages awards. (*Chavez v. Keat* (1995) 34 Cal.App.4th 1406, 1413–1416 [41 Cal.Rptr.2d 72].)

Under federal law, a punitive damages award is not dependent on proof of a defendant's ability to pay (*Kemezy v. Peters* (7th Cir. 1996) 79 F.3d 33, 33–34; *Woods-Drake v. Lundy* (5th Cir. 1982) 667 F.2d 1198, 1203, fn. 9; *Chavez v. Keat, supra,* 34 Cal.App.4th at pp. 1410–1411), but if evidence is submitted, it is an important consideration as to the reasonableness of the award. (*Patterson, supra,* 440 F.3d at p. 122; *Fall v. Indiana Univ. Bd. of Trustees* (N.D. Ind. 1998) 33 F.Supp.2d 729, 747.) A punitive damages "award should not be so high as to result in the financial ruin of the defendant. [Citation.] Nor should it constitute a disproportionately large percentage of a defendant's net worth." (*Vasbinder, supra,* 976 F.2d at p. 121; see *Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1596 [36 Cal.Rptr.2d 343] [under California law, punitive damages generally should not exceed 10 percent of defendant's net worth].) " ' "[E]ven outrageous conduct will not support an oppressive or patently excessive award of damages." ' " (*Patterson, supra,* 440 F.3d at p. 122.)

Utilizing these principles, " '[o]ur task is to make certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition.' " (*Patterson, supra,* 440 F.3d at pp. 121–122.) This evaluation requires a delicate balance between the amount necessary to deter and punish unacceptable conduct and an amount that will not result in financial devastation. This balance is particularly important when punitive damages are awarded against an individual with limited means, rather than against a financially successful business.

Based on the unchallenged evidence, Officer Barr's net worth was in the range of $50,000 to $55,000 and his annual salary was $60,000, but the punitive award was $3 million. Sergeant Toth faces a $1 million punitive judgment compared to a net worth of approximately $415,000 and a retirement income of approximately $60,000 per year. These punitive damages

awards constitute a disproportionately large percentage of each defendant's wealth and would result in defendants' financial ruin. The award was approximately 60 times Officer Barr's net worth and 50 times his annual pay. The award was approximately two and one-half times Sergeant Toth's net worth, and 16 times his annual retirement pay. An award is supposed to "sting" (*Bains LLC v. Arco Products Co.* (9th Cir. 2005) 405 F.3d 764, 777), but not impoverish a defendant. (*Vasbinder, supra,* 976 F.2d at p. 121.) The purpose of punitive damages is not served by financially destroying a defendant. (*Ibid.*)

■■■ In apparent recognition of these defendants' limited resources, Grassilli does not suggest that either defendant has the financial ability to pay the punitive damages award. Rather, he argues their financial conditions should not be a factor in our consideration because the trial court erroneously refused to allow Grassilli to introduce evidence showing the state, not the defendants, would pay for the punitive damages award. However, in support of his argument below, Grassilli relied only on Government Code section 825, which authorizes the state to indemnify a public employee for a punitive damages award only under very limited circumstances. (See fn. 10, *ante.*) Under this code section, a public entity may not pay a punitive damages award unless *the Legislature* makes a specific finding that "[a]t the time of the act giving rise to the liability, the employee . . . acted . . . in good faith, without actual malice and in the apparent best interests of the public entity." (Gov. Code, § 825, subd. (b)(2).) Because the jury's findings reflect that Sergeant Toth and Officer Barr did not act in good faith, it is unlikely the Legislature could properly authorize a reimbursement for the punitive damages. Moreover, at a posttrial motion concerning defendants' obligation to post bond, Grassilli's counsel took a contrary position to that asserted on appeal and argued Government Code section 825 would not apply.

This case differs materially from *Lawson v. Trowbridge* (7th Cir. 1998) 153 F.3d 368, relied upon by Grassilli. *Lawson* holds that indemnification evidence may be admitted on cross-examination to impeach a defendant who suggests to the jury he will be financially ruined by a large punitive damages award. (*Id.* at 379.) In *Lawson,* the evidence showed that under the applicable state law (Wisconsin), the public employee defendants would be fully indemnified for punitive damages. (*Ibid.*) In this case, Grassilli did not identify any evidence to show that defendants would be indemnified by the state. The fact there is a statutory mechanism for a public employee to be indemnified does not make this process relevant, unless there is some reasonable possibility the defendant will be indemnified under that statute.[11]

---

[11] In a petition for rehearing in this court, Grassilli submitted information showing that several months after the judgment was entered, defense counsel stated the CHP had decided to

■ Our determination that the jury's punitive damages awards are excessive is not intended as a criticism of the jurors' reasoning processes. Justifiably, the jurors wanted to punish and deter the officers' unacceptable conduct, but were given no guidance as to their role in evaluating an appropriate award vis-à-vis each defendant's financial condition. Although the court properly permitted each defendant to submit evidence of his financial condition, it refused to instruct the jury as to the relevance of this evidence. This was error, as a party is entitled to have a jury instructed consistent with his or her theory of the case, and the lack of an instruction created ambiguity and improperly invited extreme results. (See *Pacific Mutual Life Insurance Co. v. Haslip* (1990) 499 U.S. 1, 18 [113 L.Ed.2d 1, 111 S.Ct. 1032] [emphasizing importance of jury instructions to provide adequate guidance to jury in assessing proper amount of punitive damages]; *Atencio v. City of Albuquerque* (D.N.M. 1996) 911 F.Supp. 1433, 1445–1448.) Without a statement from the court that the evidence was proper for the jury to consider, the jury could have easily misunderstood the relevance and importance of this evidence. And Grassilli's counsel exacerbated the problem when, in rebuttal argument, he wrongly implied that the jury was not entitled to take this evidence into consideration in awarding the punitive damages.

Grassilli's reliance on the Ninth Circuit's model punitive damages instruction is misplaced. (9th Cir. Civ. Jury Instr. 7.5, *supra.*) This standard instruction (given by the trial court here) does not mention the defendant's financial condition because a plaintiff seeking punitive damages on a federal claim does not have the burden of producing evidence of a defendant's financial condition. Thus, in many cases there will be no financial evidence presented at trial. However, federal law permits a defendant to produce

---

indemnify defendants for the punitive damages award. Defendants agree their counsel made this statement. Grassilli argues this information means defendants' financial conditions are irrelevant to our analysis. We disagree.

Events occurring after the judgment are not properly before a reviewing court. But even if we could consider this new information, it does not show the officers will be indemnified or a likelihood that this will occur. Under Government Code section 825, subdivision (b), an employing public agency's intention or desire to indemnify its employee for a punitive damages award is only the preliminary step to a valid indemnification by the state government. The code section mandates that before indemnification can occur, the employing agency *and* the Legislature must make specific findings that the employee acted in good faith and without actual malice and in the apparent best interests of the public entity. (*Ibid.*) As noted, on the record before us, there is no reasonable basis for believing the Legislature could or would properly find these requirements were met in this case.

Based on our conclusion that there is no reasonable possibility of indemnification on the record before us, we need not reach the issue whether Government Code section 825, subdivision (b)'s prohibition on admitting evidence of public entity indemnification applies to a punitive damages claim based solely on a federal cause of action. We likewise decline to offer guidance, for any subsequent retrial, on the admissibility of evidence of the CHP's stated intent to recommend indemnification. Given the lack of a developed factual record on the issue, it would be inappropriate for us to rule on the issue at this time.

evidence of his or her financial condition to support an argument that the defendant will be financially ruined by a large award. Recognizing this, a comment to the model instruction states that the court should consider giving an instruction pertaining to the relevance of financial condition evidence *if* this evidence is offered at trial. (9th Cir. Civ. Jury Instr. 7.5 com., *supra*.) In this case, the court erred in refusing defendants' request that it instruct on the relevance of the evidence.

We also note that the jury appears to have embraced Grassilli's plea that the award be used as a platform not only to punish these individual officers, but also to punish the CHP management for encouraging its officers to be less than honest about the wrongful conduct and attempting to cover up the conduct. We would agree that the evidence in this case supported strong condemnation of this behavior. However, this evidence was not relevant to deciding the appropriate punitive damages award as against these *individual* officers.

### 3. Conclusions Regarding Punitive Damage Amount

After carefully considering the relevant factors, including the evidence at trial, the purposes of punitive damages, the constitutional guideposts, defendants' ability to satisfy a judgment, and the jury's plain intentions that a large damage amount is necessary to deter and punish the conduct, we conclude awards of no more than $35,000 as to Officer Barr, and $20,000 as to Sergeant Toth will satisfy the proper purposes of punitive damages. Considering defendants' financial conditions, these are substantial sums of money that will punish, but not financially devastate, the defendants and will also comport with the jury's obvious intentions that these and other officers understand that abuses of authority will not be tolerated.

Our substantial reduction of the award should not be misinterpreted as condoning or trivializing defendants' conduct. Although defendants continue to argue they were doing "nothing more" than enforcing the Vehicle Code, the jury reached a very different conclusion. The jury's liability and damages award reflects its findings that Officer Barr and Sergeant Toth intentionally sought to penalize Grassilli for exercising his constitutional right to complain about Officer Barr's conduct and that this campaign to harass Grassilli and intentionally injure his business constituted an extreme and outrageous abuse of law enforcement authority. These findings were fully supported on the record before us.

 Unless a court is reducing an award to the constitutional maximum, a court generally will not reduce an award without offering the plaintiff the option of a new trial on the issue. (See *Simon, supra,* 35 Cal.4th at

pp. 1187–1188; *Gober, supra,* 137 Cal.App.4th at pp. 213–214; see also *Vasbinder, supra,* 976 F.2d at p. 122.) Accordingly, we remand the case to permit Grassilli to accept these punitive award amounts or to retry the punitive damages phase.

## VI.–VIII.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

We affirm the judgment with respect to liability, compensatory damages, and attorney fees. The judgment is reversed on the punitive damages award, with the direction that the superior court is to: (1) enter judgment against Officer Barr in the amount of $35,000, or at Grassilli's option conduct a new trial on the proper amount of punitive damages against Officer Barr; and (2) enter judgment against Sergeant Toth in the amount of $20,000, or at Grassilli's option conduct a new trial on the proper amount of punitive damages against Sergeant Toth. The court is further ordered to strike $25,000 in costs to Grassilli reflecting expert witness fees. Defendants to pay Grassilli's costs on appeal.

McDonald, J., and McIntyre, J., concurred.

Petitions for a rehearing were denied October 13, 2006, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied December 20, 2006, S147514.

---

*See footnote, *ante,* page 1260.