Filed 10/17/14; pub. order 11/14/14 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

FLOYD E. SQUIRES et al.,

     Plaintiffs and Appellants,

v.

CITY OF EUREKA et al.,

     Defendants and Respondents.

A138768; A139849

(Humboldt County
Super. Ct. No. DR100894)

Appellants Floyd Squires, III and Betty Squires (when referred to collectively, plaintiffs) sued the city of Eureka and several individuals. The complaint alleged 10 causes of action, the first seven common law claims, the last three under 42 U.S.C. § 1983. Defendants filed an anti-SLAPP motion, which the trial court granted as to the first seven causes of action, allowing plaintiffs to conduct discovery on the other three. Following such discovery, defendants filed a renewed anti-SLAPP motion, which the trial court granted in an extensive order, concluding that plaintiffs had not shown a probability of prevailing on any of their remaining claims. We reach the same conclusion, and we affirm.

**BACKGROUND**

**The Relationship**

This case arises out of an October 2010 lawsuit filed by plaintiffs against the city of Eureka (City) and various individuals connected with it (when referred to collectively, defendants). The relationship between plaintiffs and the City goes back many years, at least until the early 1990's, when plaintiffs bought a property at 1429-1429½ Sunny

1

Avenue, Eureka (the Sunny Avenue property). By 2010, the time the subject lawsuit was filed, plaintiffs had acquired ownership of 26 properties, ownership that apparently led to much interaction between plaintiffs and City officials—and ultimately to the lawsuit here.

As to that interaction, and what triggered what, the parties' briefs do not agree. Plaintiffs' brief begins as follows: "Since the filing of the present lawsuit, respondents' behavior against petitioners has escalated. [Citation.] Shortly after petitioners filed this lawsuit, the City filed a lawsuit against petitioners attempting to appoint a receiver and gain control over all 26 of petitioners' properties (all except petitioners' personal residence) located within the City. [Citation.]"

Defendants' brief describes the setting this way: "Appellants Floyd and Betty Squires are property owners in the city of Eureka who own 26 properties with code violations that eventually resulted in the City of Eureka filing a receivership action. [Citation.] Appellants filed the complaint below during the pendency of the city's code enforcement administrative proceedings preceding the filing of the City receivership proceeding."[1]

**Plaintiffs' Complaint**

On October 14, 2010, plaintiffs filed a complaint for damages against the City and five individuals, identified by plaintiffs as follows: Sheryl Schaffner, City Attorney until her resignation on July 9, 2010; Michael Knight, Public Works Director/Building Official and Assistant City Manager; Brian Gerving, City Planning Manager; Gary Broughton, Deputy City Engineer; and Larry Glass, Councilman for the City Council's Ward 1. The complaint alleged ten causes of action, styled as: (1) harassment; (2) intentional interference with contractual relations; (3) intentional interference with prospective economic advantage; (4) abuse of process; (5) slander; (6) intentional infliction of emotional distress; (7) general negligence; (8) municipal liability; (9) public entity liability-failure to train; and (10) supervisor liability. The first eight causes of action were alleged against all defendants, the ninth and tenth against only the City.

---

[1] A characterization, we note, with which plaintiffs' reply brief does not take issue.

The complaint was 10 pages long, much of which described the parties and their relationships. Paragraphs 12 through 14 set forth plaintiffs' fundamental allegations, alleging as follows:

"Defendants Schaffner, Knight, Gerving, Boughton, and Glass (Individual Defendants) have engaged and continue to engage, individually and in concert, in a course of conduct and pattern of harassment, which includes a conscious intent to deceive, vex, annoy or harm Plaintiffs in their business, i.e., they are motivated by corruption and/or malice.

"The wrongful conduct by the Individual Defendants has included, for instance, taking possession of certain Plaintiffs' Subject Properties, wrongfully evicting Plaintiff's tenants, falsely swearing inspection warrants, inciting members of the public to file unfounded suits against Plaintiffs, misrepresenting and manipulating evidence, wrongfully denying Plaintiffs the right to obtain permits, filing vexatious litigation, and generally trying to harm Plaintiffs and their business.

"The Individual Defendants have conspired against, and singled Plaintiffs out, from all other property owners in this community (even though many of these property owners have property in the same or similar condition as Plaintiffs' properties) for the specific purpose of harassing, vexing, annoying and/or harming Plaintiffs. The conduct of the Individual Defendants is malicious, fraudulent and oppressive, and Plaintiffs are seeking general and special damages against Defendant City and Individual Defendants, as well as punitive damages against the Individual Defendants."

Paragraphs 17 through 65 of the complaint alleged the essential elements of the ten causes of action mentioned above.

3

**Defendants' Special Motion to Strike**

On November 18, 2010, defendants filed a special motion to strike each cause of action pursuant to Code of Civil Procedure section 415.16 (SLAPP or anti-SLAPP),[2] set for hearing on December 17.

On December 7, 2010, plaintiffs filed their opposition to the anti-SLAPP motion. The opposition ignored the first seven causes of action, focusing only on the eighth, ninth, and tenth, arguing that "plaintiffs will receive favorable judgments for their 1983 claims."

On December 9, 2010, plaintiffs filed a motion to lift stay on discovery, requesting the court shorten time so that their motion could be heard before the anti-SLAPP motion. Plaintiffs' motion sought to conduct discovery only as to the eighth, ninth, and tenth causes of action.

On February 25, 2011, the trial court filed its order, granting the motion to strike the first through seventh causes of action. The court concluded that "defendants have made an initial showing that plaintiffs' causes of action arise from protected activity under CCP section 425.16" because plaintiffs' claims against defendants "involve actions allegedly taken by the defendants in the investigation and prosecution of plaintiffs regarding code enforcement violations occurring at real properties owned by plaintiffs." The court also concluded that, "[b]ased upon the pleadings and admissible evidence presented in the supporting and opposing declarations . . . plaintiffs' [*sic*] have not demonstrated a probability of prevailing on their claims. Plaintiffs have not made a prima facie showing of facts necessary to establish their claim at trial." The order was not appealed.[3]

---

[2] All statutory references are to the Code of Civil Procedure unless otherwise indicated.

[3] Defendants had also filed a demurrer. Initially scheduled for hearing on January 14, 2011, the demurrer was reset for hearing, as stipulated by the parties. On May 20, 2011, the trial court issued an order overruling the demurrer, concluding that "the allegations set forth in the Complaint, including paragraphs 12, 13, 36, 37, 55, 58, 59, 63 and 64 are sufficient to state a cause of action," and that "absolute prosecutorial

4

**The Eighth, Ninth, and Tenth Causes of Action**

The February 25 order also ordered that plaintiffs could "conduct discovery relating to the Eighth, Ninth, and Tenth causes of action." These three causes of action were, as indicated, based on section 1983 of Title 42 of the United States Code, and they alleged as follows:

The eighth cause of action (municipal liability): "Each act of the defendants mentioned herein violated Plaintiffs' civil rights, and occurred as a result of the official policy or custom of defendant City. [¶] Plaintiffs were harmed, and the defendants' conduct was a substantial factor in causing that harm."

The ninth cause of action (public entity liability-failure to train): "Defendant City's training program was not adequate to train its officers and employees to properly handle usual and recurring situations. [¶] Defendant City was deliberately indifferent to the need to train its officers and employees adequately. [¶] The failure to provide proper training was the cause of the deprivation of Plaintiff's civil rights. [¶] The Plaintiffs were harmed, and the defendant City's failure to adequately train its employees was a substantial factor in causing Plaintiffs' harm."

The tenth cause of action (supervisor liability): "Defendant City knew, or in the exercise of reasonable diligence should have known, the Individual Defendants' wrongful conduct as described herein. [¶] Defendant City's response was so inadequate that it showed deliberate indifference to, or tacit authorization of, Individual Defendants' conduct. [¶] Defendant City's inaction was a substantial factor in causing Plaintiff's harm."

The allowed discovery ensued, and in fact over four volumes of the 1750-page clerk's transcript consists of papers filed below in connection with discovery disputes. That discovery extended over the remainder of 2011 and throughout 2012.

---

immunity is not immediately available to the moving parties given the nature of the allegations in the complaint. [Citations.]"

5

**Defendants' Renewed Special Motion to Strike**

On January 10, 2013, defendants filed their renewed special motion to strike the remaining three claims. The renewed motion was accompanied by four declarations, of: Brian Gerving, Chief Official in the City Building Department; Gary Boughton, Deputy City Engineer; Michael Knight, Assistant City Manager; and one of defendants' attorneys, Krista McNevin Jee. Defendants also filed a request for judicial notice.

On February 1, plaintiffs filed their opposition to the renewed SLAPP motion. It was apparently accompanied by four declarations, those of plaintiff Floyd Squires, his attorneys Bradford Floyd and Carlton Floyd, and Scott Penfold, an expert witness in the receivership action (whose declaration was apparently submitted late, at the hearing).[4] Attorney Brandon Floyd's declaration consisted almost entirely of his claimed version of testimony given at the trial of the receivership action (*City of Eureka et al. v. Floyd E. Squires et al.*, Super Ct. Humboldt County, No. DR110040), which case had proceeded to trial and been submitted for decision on or about January 2, 2013. According to Floyd, no trial transcript was provided for that case. Penfold's declaration said that Floyd's recitations of what occurred at trial "are accurate and consistent with my testimony given during trial." Squires's declaration consisted of 44 paragraphs, mostly addressing his version of facts as to the City's involvement with the Sunny Avenue property.

The City filed a reply memorandum, along with objections to the Squires and Floyd declarations and a second request for judicial notice.

The renewed motion to strike came on for hearing on February 13, 2013. On April 2, 2013, the trial court issued its 11-page order entitled "Rulings Re: Renewed Special Motion to Strike." The order was thorough and detailed, and began by granting both of defendants' requests for judicial notice. The court then devoted almost five pages to the objections to evidence, addressing the defendants' objections one by one, sustaining some and overruling others.

---

[4] The declaration of attorney Carlton Floyd is not in the record.

The court then turned to the substance of the motion, ultimately granting it. Doing so, the court provided an extensive discussion supporting its conclusion that plaintiffs had failed to demonstrate a probability of prevailing on the remaining three causes of action. The court began by dividing the alleged violations into two categories: (1) acts that, on their face, could be a violation of plaintiffs' rights; and (2) treating plaintiffs as a "class of one" that defendants selectively prosecuted for an impermissible motive.

As to the first category of violations, the court found that: "To substantiate the first category of violations, the Squires [plaintiffs] submit the declarations of . . . [attorney] Floyd and Floyd Squires. . . . [¶] Floyd Squires's declaration similarly does not make a prima facie showing of facts sufficient to sustain a judgment in the Squires'[s] favor. Squires faults Assistant City Manager Michael Knight for executing an inspection warrant . . . many years ago, in 2004, to determine whether debris was being dumped on the property. Yet, Squires simultaneously explains in detail his belief that the warrant was based on an actual informant who, unbeknownst to Eureka, had purposely dumped debris on the property because of a personal vendetta against Squires. Clearly, Squires thinks it suspicious that Knight may have relied on an informant that Squires believes has no credibility. But even had Knight done so, the Court fails to see how that reliance would be a violation of the Squires'[s] civil rights; Squires himself characterizes Knight's reliance as Knight being duped, not Knight being malicious. . . . Squires also complains about a search years later in which Eureka alleged that sewage from the property was draining into 'the gulch' and garbage was being dumped onto the property. Squires characterizes this search as improper, yet admits that 'the tenant in the upper house had connected a washing machine on his deck to a house gutter to drain and the gray water was draining into the woods.' He also admits that furniture and household items had been thrown on the property by his tenants, and that a stack of 'building debris' was in the driveway.

"In sum, the Court fails to see anything in the declarations of [attorney] Floyd or Floyd Squires sufficiently substantiating the grave allegations of the Complaint, such as that Defendants falsely swore inspection warrants and manipulated evidence."

In regard to the second category of violations—that the plaintiffs constitute a "class of one" that defendants selectively prosecuted for an impermissible motive—the court found as follows:

"The problem the Squires encounter with respect to this second category is twofold. First, the Court agrees with Defendants that the Squires have not offered evidence that any of the community members who are allegedly treated more favorably are similarly situated to the Squires. (*See Squaw Valley* [*Dev. Co. v. Goldberg*] (9th Cir. 2004) 375 F.3d [936,] 944 [class of one theory must be based on the fact that the plaintiff has been treated differently from other 'similarly situated'].) The record makes clear that the Squires could be unique in the community for at least two reasons: they own 13 different properties in Eureka and the aggregate number of violations on those properties is great.

"Second, the Court concludes that the Squires have not made a sufficient showing that Defendants had an 'impermissible motive' in singling them out. (*See Squaw Valley*, *supra,* 375 F.3d at p. 944.) The record is full of *allegations* of an impermissible motive but the only *evidence* of an impermissible motive is the fact that Defendants posted an abatement notice on the same day that the Squires lodged with Eureka their claim for money damages that was prerequisite to this suit.

"The Court acknowledges that the close proximity in time between the Squires' lodging their claim and Defendants' abatement notice is circumstantial evidence that the reason Eureka singled out the Squires was to retaliate against them. However, the Court is unconvinced that the timing alone is sufficient to demonstrate an impermissible motive. The timing does not appear nearly as suspicious once it is understood that Eureka issued at least ten abatement notices on the Squires' properties in recent years, none of which has been shown to be unfounded. (*See* [citation]; *Vargas* [*v. City of Salinas* (2009) 46 Cal.4th 1] at p. 20 [anti-SLAPP motion should be granted ' "if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim" '].)

8

"Perhaps it could be argued that all ten abatement notices were retaliation for the Squires'[s] claim for damages. But there is a more fundamental problem with the purported retaliatory motive; namely, that the Squires claimed that there were being singled out *before* Eureka even had notice of the claim for money damages. The claim for money damages itself alleges that Defendants 'have conspired against, and singled claimants out, from all other property owners in this community . . . for the specific purpose of harassing, vexing, annoying and/or harming claimants.' . . . Since the Squires believed and claimed that they were being singled out before they lodged the claim for damages, the Court has trouble accepting the argument that the reason they are being singled out is *because* they made the claim for damages."

On May 23, 2013, plaintiffs filed their notice of appeal, stating they were appealing from the "Ruling Re: Renewed Motion to Strike." This appeal was numbered in this court case number A138768.

On May 31, 2013, defendants filed a motion for attorney fees. Plaintiffs filed opposition, and defendants a reply. The motion came on for hearing on July 1, and on July 29, the trial court entered its order awarding defendants $57,414.28, significantly less than they sought.

On September 24, 2013, plaintiffs filed another notice of appeal, stating that they were appealing the "Judgment entered May 30, 2013 and order granting statutory attorney fees entered July 29, 2103 under Code of Civil Procedure section 904.1(a)(13)." This appeal was numbered in this court case number A139849. By order dated May 2, 2014, we ordered the appeals consolidated.

## DISCUSSION

### SLAPP Law and Standard of Review

We recently discussed the SLAPP law and its operation in *Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 463–464:

"Subdivision (b)(1) of section 425.16 provides that '[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in

9

connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.' Subdivision (e) elaborates the four types of acts within the ambit of a SLAPP, including, as pertinent here, '(4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.'

"A two-step process is used for determining whether an action is a SLAPP. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity, that is, by demonstrating that the facts underlying the plaintiff's complaint fit one of the categories spelled out in section 425.16, subdivision (e). If the court finds that such a showing has been made, it must then determine the second step, whether the plaintiff has demonstrated a probability of prevailing on the claim. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 (*Navellier*).)

" 'The Legislature enacted section 425.16 to prevent and deter "lawsuits [referred to as SLAPP's] brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (§ 425.16, subd. (a).) Because these meritless lawsuits seek to deplete "the defendant's energy" and drain "his or her resources" [citation], the Legislature sought " 'to prevent SLAPPs by ending them early and without great cost to the SLAPP target' " [citation]. Section 425.16 therefore establishes a procedure where the trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation.' (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192.)

"Finally, and as subdivision (a) of section 425.16 expressly mandates, the section 'shall be construed broadly.'

"With these principles in mind, we turn to a review of the issues before us, a review that is de novo. (*Grewal v. Jammu* (2011) 191 Cal.App.4th 977, 988 (*Grewal*).)"

**Plaintiffs' Causes of Action Arise from Protected Activity**

The trial court found that "defendants have made an initial showing that plaintiffs' causes of action arise from protected activity under CCP section 425.1" because

10

plaintiffs' claims against defendants "involve actions allegedly taken by the defendants in the investigation and prosecution of plaintiffs regarding code enforcement violations occurring at real properties owned by plaintiffs." This was undisputed by plaintiffs below, and is expressly conceded here. Thus the issue before us involves that in the second step of the SLAPP analysis: whether plaintiffs demonstrated a probability they would prevail.

### Plaintiffs Have Not Demonstrated a Probability of Prevailing

*Introduction to the Analysis*

Plaintiffs' opening brief begins with a passage that includes a short "Introduction," a "Statement of the Case" (including a one-page statement of facts), and a "Statement of Law." All this is in some four pages. Plaintiffs' brief then sets forth what they claim are the "Legal Standards for Anti-SLAPP Claims," a short passage that ends with this: "Unlike the summary judgment statute, the anti-SLAPP statute expressly permits the court to consider the parties' pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based. (Code Civ. Proc., § 425.16(b)(2).) [¶] If the court determines that petitioners have established this minimal threshold of a 'probability' of recovery, as it should, the action proceeds."

From there, plaintiffs go on to discuss what they have "alleged," and to cite several times to their opposition brief in the trial court as though this will avail them. It will not. The law is that plaintiffs cannot rely on their own pleadings, even if verified, to demonstrate a probability of success on the merits. (*Hecimovich v. Encinal School Parent Teacher Organization, supra,* 203 Cal.App.4th at p. 474; *Paiva v. Nichols* (2008) 168 Cal.App.4th 1007, 1017.)

Unfortunately, perhaps impelled by plaintiffs' reference to their pleadings, defendants devote some 10 pages in their respondents' brief to argument that the plaintiffs' "complaint fails to allege any constitutional injury." While it is true that plaintiffs' burden requires that they show a legally sufficient claim (*Navellier, supra,* 29 Cal.4th at p. 93), we also note that defendants' demurrer was overruled. (See fn. 3, *ante*.) Thus, we refrain from any analysis of the pleadings, and turn, as is usual, to the

11

factual showing by plaintiffs, to determine whether they met the burden imposed on them under the second step in the SLAPP analysis.  And conclude they did not.

### *The Law*

We confirmed the applicable law in *Grewal, supra,* 191 Cal.App.4th at page 989: "We decide the second step of the anti-SLAPP analysis on consideration of 'the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based.'  (§ 425.16, subd. (b).)  Looking at those affidavits, '[w]e do not weigh credibility, nor do we evaluate the weight of the evidence.  Instead, we accept as true all evidence favorable to the plaintiff and assess the defendant's evidence only to determine if it defeats the plaintiff's submission as a matter of law.'  (*Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 699–700.)  [¶] That is the setting in which we determine whether plaintiff has met the required showing, a showing that is 'not high.'  (*Overstock.com, Inc. v. Gradient Analytics, Inc., supra,* 151 Cal.App.4th at p. 699.)  In the words of the Supreme Court, plaintiff needs to show only a 'minimum level of legal sufficiency and triability.'  (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 438, fn. 5.)  In the words of other courts, plaintiff needs to show only a case of 'minimal merit.'  (See *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 675, quoting *Navellier v. Sletten*[, *supra,*] 29 Cal.4th 82, 95.)"

While plaintiffs' burden may not be "high," they must demonstrate their claim is legally sufficient. (*Navellier, supra,* 29 Cal.4th at p. 93.)  And they must show it is supported by a sufficient prima facie showing, one made with "competent and admissible evidence." (*Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1236; see *Evans v. Unkow* (1995) 38 Cal.App.4th 1490, 1497.)

### *Defendants' Showing*

As noted, defendants' renewed motion was supported by four declarations, three of which were of named defendants.  Those declarations testified about the interactions

12

with plaintiffs and their properties, testifying in great detail as to specific incidents and events.

One such declaration was that of Brian Gerving, the City's Chief Building Official since August 2010 and, among other things, a building official for several years before that. Gerving described observing six code violations at the Sunny Avenue property in the course of serving a criminal search warrant on those premises in October 2009. Gerving notified Floyd Squires of these violations, they were not corrected, and additional citations and enforcement were necessitated. And as of December 26, 2012, the date of Gerving's declaration, the violations still had not been corrected.

Gerving also described serving an inspection warrant on another property owned by plaintiffs (117/119 5th Street), where he observed 39 violations. This resulted in written notice of violations, a nuisance abatement hearing resulting in fines, and assessment against the property for the fines. Gerving engaged in further abatement efforts on December 23, 2010 and obtained an inspection warrant in May 2011 which revealed a violation of an injunction that the City had obtained in July 2009, which was affirmed by the Court of Appeal in May, 2011, preventing the property from being used as sleeping quarters.

Gerving testified about several other properties, including similar enforcement proceedings at 315 C Street; inspection and related abatement activities at 317 C Street; seven new violations at 833 H Street (coupled with a failure to correct prior violations), and unpaid administrative fines resulting from an assessment against the property for $34,918.50. Gerving went on to describe additional actions in response to earthquake damage at 219 5th Street that caused red tagging of the building. Finally, Gerving described additional code enforcement activities at 1233 A Street, 2325 2nd Street, 1625 G Street, and 1803 C Street, all with plaintiffs failure to comply.[5]

Assistant City Manager Michael Knight, whose responsibilities included oversight of the Building and Public Works Departments, also submitted a declaration in support of

_____

[5] Gerving also explained how City building officials are trained and certified.

13

the renewed motion to strike, which declaration described his enforcement activity with respect to four of plaintiffs' properties. The first was property at 117/119 9th Street, concerning which Knight instituted an administrative nuisance abatement hearings, and at which he testified (as well as at court hearings). Knight's inspection, testimony, and other enforcement efforts "directly related to the City's determination to file administrative, civil and criminal proceedings concerning the property."

Knight described how the 10 serious code violations at 315 C Street documented by Gerving created an immediately dangerous condition and his approval of the subsequent summary abatement of such dangerous conditions, working along with the City Attorney. Knight also prepared documentation to the Board of Appeals/Hearing officers in April 2010 with respect to violations on this property, and how the Board determined that the property was a substandard building and a public nuisance—a ruling plaintiffs did not appeal. Finally, Knight described environmental health code enforcement at the Sunny Avenue property which included County of Humboldt officials and Fish and Game representatives.[6]

### Plaintiffs' Response

As noted, plaintiffs attempted to meet their burden under the second step of the SLAPP analysis with four declarations, only three of which are in the record here, those

---

[6] The only declaration addressing any of these facts was that submitted by Floyd Squires, who admitted that "gray water was draining into the woods" from "the tenant in the upper house" who had connected "a washing machine to a house gutter drain," tenants had thrown broken furniture and household items over the bank, building debris remained on a site, and that a representative of the "Corps of Engineers" said "pick up the debris out of the water and take it to the dump . . . ."

Squires's declaration in fact made two references to Michael Knight. The first was conclusory: "Mike Knight fabricated search warrants on all our properties at one time or another." Defendants' objection, including on grounds of lack of foundation, speculation, lack of personal knowledge, and argumentative, was sustained by the trial court. The second was that Squires attached a list of actions he claimed that Knight had taken against him concerning various properties he owned in the City. Defendants objected to the list on a number of grounds, including relevancy, lack of foundation, speculation, lack of personal knowledge, hearsay, and argumentative. The trial court sustained the objection.

14

of:  (1) one of plaintiffs' attorneys, Bradford Floyd; (2) Scott Penfold; and (3) Floyd Squires.  As also noted, attorney Floyd's declaration consisted almost entirely of his description of what he asserted was testimony given at the trial of the receivership action.  The sum total of Penfold's declaration was that Floyd's recitations of what occurred at trial "are accurate and consistent with my testimony given during trial."  And Squires's declaration consisted of 44 paragraphs, mostly addressing his version of facts as to the City's involvement with the Sunny Avenue property.

Defendants filed objections to both the Squires and Floyd declarations, objections that totaled 39 in number.  The trial court ruled on the objections one by one, and sustained 25 of them (some of which were sustained in part).  Most of the sustained objections were to Floyd Squires's declaration, and plaintiffs do not contest any of those evidentiary rulings on appeal.

As discussed hereafter, plaintiffs here rely almost exclusively on the Floyd declaration, to his claimed attributions about what City witnesses purportedly testified to in the receivership action.  Before turning to a discussion of plaintiffs' attempted factual showing, we begin with a description of their legal position, which is contained in three arguments, in a total of 13 pages.  Plaintiffs' first argument is entitled "Municipal Liability" (42 U.S.C. 1983), and has four subarguments, labeled as follows: (1) "Respondents' Actions Against Petitioners Were Approved by the City's Lawmaking Officers or Policy Making Officials"; (2) "Respondents Violated Petitioners' Equal Protection Rights Because Respondents Did Not Give Petitioners Equal Protection of the Law"; (3) "Respondents Violated Petitioners' Substantive Due Process Rights Because Respondents Have Deprived Petitioners' [*sic*] of Their Property for Arbitrary Reasons," and (4) "Respondents Have Violated Petitioners' Fourth Amendment Rights By Falsely Swearing Their Search Warrants and Affidavits and/or Entering Petitioners' Properties for Inspection Without Permission and Without Inspection Warrants"  The last two arguments, set forth in fewer than four pages, are entitled, "(2) Public Entity Liability— Failure to Train"; and "(3) Supervisor Liability."

15

Most of what is contained in these arguments are cases cited for general propositions of law, with little discussion of how the facts in plaintiffs' opposition support the actual law governing here—law devastating to plaintiffs.

To begin with, in order to support a claim for municipal liability under section 1983, that alleged in the eighth cause of action, plaintiffs must demonstrate that they suffered a constitutional injury at the hands of a municipal employee. (*City of Los Angeles v. Heller* (1986) 475 U.S. 796, 799 ["[N]either *Monell v. New York City Dept. of Social Services* (1978) 436 U.S. 658, nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when, in fact, the jury has concluded that the officer inflicted no constitutional harm."].)

Defendants devote over 10 pages of their brief demonstrating that plaintiffs have not shown any constitutional injury. Plaintiffs' entire response is in this one nine-line paragraph: "The declaration of Bradford C. Floyd also shows that both Brian Gerving and Mike Knight were the ones going around and posting the notices to abate and attempting to have a receiver appointed over respondents' properties. [Citation.] Furthermore, Fitzhugh stated that Gerving and Knight were treating the petitioners differently from other property owners and singling them out with the notices to abate. [Citation.] As has already been stated above under the equal protection and substantive due process claims, there was no rational basis for posting each property owned by petitioners, yet, Gerving and Knight did so anyways. These specific actions of Gerving and Knight are exactly what causes respondents' constitutional deprivations."

We fail to see how attorney Floyd's "testimony" demonstrates any injury to plaintiffs, let alone constitutional injury. And not one paragraph in Floyd Squires's declaration testifies about any injury.[7]

As indicated, the trial court treated plaintiffs' "equal protection" claim as involving a "class of one." Such a claim requires plaintiffs to demonstrate three

_____

[7] The attachment to the Floyd Squires declaration entitled "Knight Wrongful Actions" might be read as to include some injury. That attachment was ruled inadmissible by the trial court.

16

elements: (1) plaintiffs were treated differently than other similarly situated persons; (2) the different treatment was intentional; and (3) there was no rational basis for the difference in treatment. (*Village of Willbrook v. Olech* (2000) 528 U.S. 562, 564 (*Olech*); *Genesis Environmental Services v. San Joaquin Valley Unified Air Pollution Control Dist.* (2003) 113 Cal.App.4th 597, 605.)

To satisfy the first element, plaintiffs must not only demonstrate a disparity in treatment but also that "the level of similarity between [them] and the persons with whom they compare themselves must be extremely high." (*Neilson v. D'Angelis* (2004) 409 F.3d 100, 104; accord, *Racine Charter One, Inc. v. Racine Unified School Dist.* (7th Cir. 2005) 424 F.3d 677, 686 [to be considered " 'similarly situated,' " comparators must be " '*prima facie* identical in all relevant respects' " or " 'directly comparable to [plaintiff] in all material respects' "].)

The undisputed testimony of the City's representatives established that plaintiffs had a long history of noncompliance with respect to their properties, properties that were the subject of ongoing—and frequent—complaints from neighbors and residents. Plaintiffs submitted no declarations establishing any such similar conduct by any other owner of multiple properties.

Moreover, *Olech, supra,* 582 U.S. 562 at p. 564, held that disparate treatment is permissible if it has a rational basis. "Under the rational basis test, courts must presume the constitutionality of government action if it is plausible that there were legitimate reasons for the action. In other words, the plaintiff must show that the difference in treatment was 'so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the [government's] actions were irrational.' [Citation.] Proving the absence of a rational basis can be an exceedingly difficult task. In some circumstances involving complex discretionary decisions, the burden may be insurmountable." (Accord, *Las Lomas Land Company, LLC v. City of Los Angeles* (2009) 177 Cal.App.4th 837, 859 (*Las Lomas*).)

Likewise well established is that individualized discretionary decisions will not support a class of one claim. Again, the Supreme Court is apt: "There are some forms of

17

state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments.  In such cases the rule that people should be 'treated alike, under like circumstances and conditions' is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise." (*Engquist v. Oregon Dept. of Agriculture* (2008) 553 U.S. 591, 603; also see *Las Lomas, supra,* 177 Cal.App.4th at pp. 859-860.)  Such rule applies here, with the discretion necessarily inherent in enforcing city codes and ordinances as to individual properties containing different violations and different classes and types of owners.  Such rule precludes plaintiffs' claim.

As quoted, the trial court concluded that Floyd's declaration (and, for that matter, that of Penfold) "do not substantiate any wrongful conduct of Defendants other than their allegedly singling out the Squires for investigation and prosecution."  The trial court also noted that, while the Squires declaration "faults Assistant City Manager Michael Knight for executing an inspection warrant" for the Sunny Avenue property "many years ago in 2004," Squires also acknowledged that the warrant was based upon "an actual informant who unbeknownst to Eureka had purposely dumped debris on the property because of a personal vendetta against Squires."  The trial court failed to see how the city's reliance on the informant could be a violation of plaintiffs' civil rights.  So do we.

Virtually ignoring Squires's testimony in their briefs on appeal, plaintiffs focus their factual showing on the declaration of attorney Floyd who, as noted, purported to testify as to what others had testified to in the receivership action.  Without discussion, the trial court overruled defendants' objections to Floyd's declaration on the basis that

18

they were "party admissions", and went on to hold that Floyd's declaration did not make the requisite showing under the second step of the SLAPP analysis.[8]

Passing over the evidentiary issue, we conclude, as did the trial court, that plaintiffs' "factual" showing is manifestly insufficient. For example, under their "equal protection" argument, plaintiffs' opening brief says this: "There was ample testimony at the receivership trial in which the City's own employee, Mr. Fitzhugh, stated that on multiple occasions, the City and it's [*sic*] employees singled petitioners out and treated them differently than other property owners in Eureka. [Citation.] Furthermore, Mr. Fitzhugh testified that it was not a practice the City usually followed to go around the City searching for violations. [Citation.] The reason he gave was that if it did that, it would find many other houses in much worse condition than those owned by petitioners. [Citations.] In petitioners' case, the respondent singled petitioners out, inspecting every one of their properties within the City's jurisdiction, and posting notices to abate on each one of them. [Citation.] [¶] . . . [¶] Finally, the photos described and attached to the Declaration of Bradford Floyd show that many petitioners' [*sic*] properties that have been under respondents' scrutiny are clearly in much better condition than the neighboring houses. [Citation.]" Such conclusory "testimony" does not meet any, let alone all, the elements required under *Olech, supra,* 582 U.S. 562 at p. 564.

Floyd's declaration did not establish that Fitzhugh had any knowledge or involvement in the particular matters on which the individuals had testified, or was aware of the large number of complaints that city officials had received about plaintiffs' properties. Moreover, nothing in Floyd's declaration indicated, let alone demonstrated, that any other property owner engaged in conduct manifesting the consistent noncompliance concerning serious problems in the conditions and activities on their

---

[8] Defendants renew their evidentiary objections here, which, we note, might be well taken, as the issue is not so simple. As Witkin describes it: "The admissions of an agent or employee who is a party to the action are, of course, received in evidence against that party. But the introduction of these statements against the principal or employer raises problems of substantive law as well as evidence." (1 Witkin, Cal. Evidence (5th ed. 2012) § 120, p. 952.)

properties as did plaintiffs. Nor any other owner who has prompted the number and frequency of resident and neighborhood complaints that plaintiffs generated concerning their property. In sum and in short, nothing in Floyd's declaration claiming to testify about the claimed testimony of Mr. Fitzhugh even addressed, much less disputed, the testimony in the declarations submitted by defendants.

Also under subargument 2, plaintiffs make reference to two cases, and conclude: "This is similar to petitioners' case because respondents have been attempting to deprive petitioners of their property for arbitrary reasons. [Citation.] . . . [¶] . . .[¶] One possible reason for the large number of inspections and posting on petitioners' properties is based in retaliation. On April 13, 2010, petitioners filed a claim against the City for damages. On the same day, April 13, 2010, the City caused to be posted on one of petitioners' properties a notice to abate. The closeness in time to petitioners' claim against the City shows that the notices to abate were retaliatory in nature. [Citation.]" Such conclusory statement is unavailing.

The ninth cause of action was for "Failure to Train (42 USC 1983)." The elements of such cause of action are well established,[9] and include that the City "knew because of a pattern of similar violations that the inadequate training was likely to result in a deprivation" of some right of plaintiffs. Put otherwise, the inadequate training must

---

[9] The CACI jury instruction (no. 3003) provides as follows:

"[Name of plaintiff] claims that [he/she] was deprived of [his/her] civil rights as a result of [name of local governmental entity]'s failure to train its [officers/employees]. To establish this claim, [name of plaintiff] must prove all of the following:

"1. That [name of local governmental entity]'s training program was not adequate to train its [officers/employees];

"2. That [name of local governmental entity] knew because of a pattern of similar violations[, or it should have been obvious to it,] that the inadequate training program was likely to result in a deprivation of the right [specify right violated];;

"3. That [name of officer or employee] violated [name of plaintiff]'s right [specify right]; and

"4. That the failure to provide adequate training was the cause of the deprivation of [name of plaintiff]'s right [specify right]."

20

amount to a deliberate indifference to constitutional rights. (*Clouthier v. County of Contra Costa* (9th Cir. 2010) 591 F.3d 1232, 1242.)  Such deliberate indifference requires proof of a pattern of violations (except in those few very rare situations in which the unconstitutional consequences of failing to train are patently obvious).  (See *Connick v. Thompson* (2011) __ U.S. __ [131 S.Ct. 1350, 1361]; see generally *City of Cantor v. Harris* (1989) 489 U.S. 378, 388-389.)

Plaintiffs' claimed showing in their opening brief[10] as to this element is in two paragraphs:  "As was explained above, each respondent was implementing policies created by lawmaking officers/policymaking officials of respondent City.  The regularity of respondents' constitutional violations makes it highly unlikely that respondent City's employees were receiving adequate training with regard to how their actions were violating petitioners' civil rights.  How else would such unconstitutional behavior be so widespread throughout respondent City's directors and employees?
[¶] . . . [¶] Furthermore, as proof that the City knew it had not been adequately training its employees in civil rights violations is due to the various claims to respondent City petitioning it to stop violating petitioners' rights.  [Citation.]  Respondents simply denied the claims and their conduct in violation of petitioners' civil rights described above only intensified.  [Citations.]"  Such showing is inadequate.

The tenth cause of action was for "Supervision Liability" which, as plaintiffs acknowledge, also requires among other elements deliberate indifference, as held in *Grassilli v. Barr* (2006) 142 Cal.App.4th 1260, 1279:  "To establish supervisor liability under section 1983, petitioners must show:  (1) the supervisor had actual or constructive knowledge of respondent's wrongful conduct; (2) the supervisor's response 'was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) the existence of an affirmative cause link between the supervisor's inaction and plaintiff's injuries."

---

[10] Plaintiffs' reply brief does not even mention the ninth or tenth causes of action.

Plaintiffs' claimed showing of this law says this: "In this case, petitioners have been through multiple lawsuits with respondents City as well as made various claims to respondent City, petitioning them to stop its violation of petitioners' rights. [Citations.] Thus, the City and its supervisors, many of whom are respondents in this case have been aware of this conduct as long as it has been going on. [Citation.] Respondent City and even the individual respondents have instituted the majority of the lawsuits against petitioners as well as denial of petitioners' claims. [Citations.] [¶] Neither respondent City nor its supervisors took any actions to address petitioners' grievances; instead the violative behavior has only increased and intensified. [Citations.] For example, shortly after filing this lawsuit against respondents, the City filed its own lawsuit attempting to have a receiver appointed over 26 of petitioners' properties. [Citation.] Again, this shows that the heightened harassment of petitioners has all been instituted by respondent City as well as the individual respondents, thus there has undoubtedly been tacit authorization of the individual respondents and other City employees' conduct." It is manifestly deficient.

## DISPOSITON

The orders are affirmed. Defendants are awarded their costs and attorney fees on appeal.[11]

---

[11] Defendants' brief ends with the request that we "award the City its attorney's fees on appeal subject to a showing *to this Court* by declarations and supporting invoices as to the reasonableness of the amount of the fees incurred and sought by respondents." At oral argument, defendants' counsel renewed the request that this court hear and determine the attorney fee issue. We allowed supplemental letter briefing on the subject, which we have reviewed. And we now deny the request. While defendants are, under the anti-SLAPP statute, entitled to their fees on appeal (see *Evans v. Unkow, supra,* 38 Cal.App.4th 1490), the usual procedure is for the trial court to determine the amount of such fees. (See *City of Alhambra v. D'Ausilio* (2011) 193 Cal.App.4th 1301, 1310; see generally, Pearl, Cal. Attorney Fee Awards (2014) § 12.13, p. 12-9.)

_____
Richman, J.

We concur:


_____
Kline, P.J.


_____
Brick, J.[*]

_____

[*] Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| FLOYD E. SQUIRES et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF EUREKA et al., <br><br> Defendants and Respondents. | A138768; A139849 <br><br> (Humboldt County <br> Super. Ct. No. DR100894) |

**THE COURT:**

The opinion in the above-entitled matter filed on October 17, 2014, was not certified for publication in the Official Reports. For good cause appearing and pursuant to California Rules of Court, rule 8.1105, the opinion in the above-entitled matter is ordered certified for publication in the Official Reports.


Dated: _____                    _____
                                                              Kline, P.J.

24

Trial Court:                                            Humboldt County Superior Court

Trial Judge:                                          Honorable W. Bruce Watson

Attorney for Plaintiffs and Appellants:      Law Office of Bradford C. Floyd, Bradford C. Floyd, Carlton D. Floyd

Attorneys for Defendants and Respondents:    Cyndy Day-Wilson, City Attorney, City of Eureka; Burke, Williams & Sorensen, Manuela Albuquerque